**Thomas W. GRIFFITH, Plaintiff,**

v.

**WHEELING–PITTSBURGH STEEL CORPORATION and American Commercial Lines, Inc., Defendants.**

Civ. A. No. 73–706.

United States District Court,
W. D. Pennsylvania.

June 15, 1978.

See also 3 Cir., 521 F.2d 31.

Thomas L. Cooper, Gilardi & Cooper, Pittsburgh, Pa., for plaintiff.

William L. Standish, IV, Arthur H. Stroyd, Jr., Allison M. Barnes, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant Wheeling.

John W. Jordan, IV, Thomson, Rhodes & Grigsby, Pittsburgh, Pa., for defendant American.

## MEMORANDUM OPINION

TEITELBAUM, District Judge.

This is an action for damages brought by Thomas W. Griffith pursuant to the Longshoremen's and Harbor Worker's Compensation Act, 33 U.S.C. § 901 *et seq.* arising out of a May 26, 1973 accident.[1]

On February 11, 1973, Griffith began his employment with the Wheeling-Pittsburgh Company at its Allenport, Pennsylvania plant. Griffith began work in the common labor pool of the construction department. The nature of his work was such that he would report to the pool each morning and thereafter report to whatever assignment was available that day. During this period, all of Griffith's duties were performed on land.

On April 1, 1973, Griffith bid into the hot mill labor pool. As was the case with his work previously, while a member of the hot mill labor pool, Griffith had no permanent duties, but rather was assigned to various jobs on a daily basis.

Including the date of the accident as a full day of work, Griffith worked 74 days

---

1. The pertinent provision of the Longshoremen's and Harbor Worker's Compensation Act is Section 905(b) which states: "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of Section 933 of this title and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide shipbuilding or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing shipbuilding or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."

for Wheeling-Pittsburgh. Of this time, he was temporarily assigned to work at the company's barge landing with longshoreman-type duties for 3¾ days. Thus of Griffith's work while he was employed by Wheeling-Pittsburgh, 94.6% was exclusively upon the land and only 5.4% of the time that he was employed by the company was spent in and about the barge landing at the Allenport plant. Of that 5.4% only about one-half of that time was actually spent working on a barge while it was in the water. The rest of the time that he was assigned to the barge landing, Griffith spent working on the railroad cars in the billet yard.

On the date of the accident, Griffith was assigned to work with the barge crew at the landing to assist in the loading of two barges. The barge on which the accident was to occur, No. 2730, was owned by defendant American Commercial Lines, Inc. (American). Three days earlier, on May 23, it had been delivered to Wheeling and was incorporated into the latter's "coal fleet" to await future use. On May 25, No. 2730 was relocated next to the seawall at the barge landing to take on a load of sheet steel which was destined to move down river to Louisville, Kentucky. A second barge, described as a pipe barge, was positioned next to No. 2730, and it too was to be loaded. The pipe barge was positioned immediately next to the seawall, and No. 2730 was lashed alongside further out on the river.

On the morning of the accident, Griffith and the regular rivermen in the barge crew first loaded pipe into the pipe barge. During the loading of the pipe barge, which was completed before Noon, Griffith worked on the seawall and barge. No. 2730 was then moved into position for loading by a procedure known as "rounding" in which a crane on the seawall pushed the barges away from the wall permitting the current to turn the boats around in the water so that No. 2730 was situated next to the seawall. Griffith's sole assistance during the procedure involved his throwing ropes from one barge to the other.

The crew then turned to the loading of No. 2730. At that time, Joseph Allfree, the crew's foreman, who was employed as river foreman by Wheeling, became aware that the barge covers were difficult to move. The wheels and track mechanism on which the covers ordinarily roll were without lubrication and were rusty and bent. At about 2:00 P.M. Allfree directed the crew to stop loading the barge and to close the covers. Allfree then returned to his office away from the area. The only other experienced riverman on the crew, Joseph Armstrong, then had difficulty closing one of the covers. A cable was attached from the crane on the seawall to the cover to pull it shut; a second cable was attached to an adjacent cover for leverage. Because eyelets on the stuck cover were missing, the hook at the end of the cable was attached to the lip on the underside of the cover. Both Armstrong and plaintiff were standing on top of the stuck cover when tension was applied to the cable. As the stuck cover began to rise they stepped back onto an adjacent cover, but that cover moved backward and the two men fell into the hold and both were injured.

Griffith filed this action against both his employer Wheeling and the vessel owner American alleging negligence on the part of both. Both defendants have denied liability to Griffith and cross-claimed against each other for indemnification or contribution. A non-jury trial was held on October 25, 1977 through October 28, 1977. Considering all the evidence elicited at trial, the following shall constitute findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

## LAND–BASED STANDARD OF NEGLIGENCE

There is general agreement that the case *sub judice* should be governed by the applicable land based standard of negligence. *Griffith v. Wheeling-Pittsburgh Steel Corporation*, 521 F.2d 31, 44 (3d Cir. 1975). Far less consensus is available, however, when discussion turns toward the question of what is the appropriate land based standard.

The traditional judicial posture has been to rely upon the *Restatement (Second) of Torts 343A* (1965) for standard of care. As Judge Hunter noted in *Hurst v. Triad Shipping Company*, 554 F.2d 1237, 1248 (3d Cir. 1977):

". . . admiralty courts applying amended section 905(b) generally have turned to the Restatement (Second) of Torts as the national expression of nonmaritime tort principles."

Representative of such a history of adherence to the Restatement standard has been the Western District Court of Pennsylvania in general, and this Court in particular. *Griffith v. Wheeling-Pittsburgh Steel Corporation*, C.A. No. 73–0706 (March 22, 1977); *Duncan v. Dravo Corp.*, 426 F.Supp. 1048 (D.C.1977).

An emerging trend, on the other hand, has favored defining the standard of negligence as imposing a duty to exercise reasonable care under all of the circumstances of the case. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); *Rowland v. Christian*, 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561 (1968). We take the opportunity afforded by the instant case to reassess whether or not Restatement (Second) Section 343A is a viable national standard of land based negligence.

Restatement (Second), Section 343A provides:

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees."

"The distinctions which the common law draws between licensee and invitee were inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism." *Kermarec, supra*, 358 U.S. at 630, 79 S.Ct.

at 410. In many instances under the Restatement standard, this feudal categorization predetermined substantive consequences rather than being one factor which contributed to an overall evaluation of the alleged breach of duty. A general standard of reasonable care under all the circumstances allows the relationship of the landowner *vis a vis* the plaintiff to be considered to the extent relevant and invested with the weight deemed to be appropriate. Varying standards of due care depending upon the applicable agrarian classification cease to be dispositive of the case, but rather the landowner/plaintiff relationship is one factor among many which is relevant in determining the negligence quotient.

▆ This Court is of the belief that the major advantage to such a uniform standard of negligence would be the forthright articulation of reasons for decision. No longer would it be judicially acceptable to state that because a plaintiff is an invitee the standard of care is inflexibly prescribed. The Court must instead state that the plaintiff/landowner relationship is significant because of specified reasons. Although as a practical matter most cases, such as the case *sub judice*, would reach the same result under either a general standard of due care or the Restatement (Second) formulation, the decisions in the remaining minority of landowner negligence cases and the quality of jurisprudence in all such cases would be enhanced. Accordingly, the applicable land based standard of negligence applied in the instant case is a duty to exercise reasonable care under all of the circumstances of the case.[2]

## LIABILITY OF AMERICAN AND WHEELING–PITTSBURGH

The potential liability of American can be examined straightforwardly by measuring its conduct against the land based negligence scale previously discussed. Liability can attach to Wheeling-Pittsburgh under Section 905(b) if negligent, only if two addi-

---

2. For those who might contend that "a general duty of care under the circumstances" standard is too indefinite to be effective, brief mention need only be made of the enduring quality of the "reasonable man" standard.

tional conditions precedent have also been satisfied:

(1) Wheeling-Pittsburgh must have been owner *pro hac vice* of the American Vessel at the time of injury;

(2) Wheeling-Pittsburgh must have been negligent in a non-stevedoring capacity.

The status of Wheeling-Pittsburgh as owner *pro hac vice* at the time of injury is well established under both the law of the case and the applicable case law. [D.C.], 384 F.Supp. [230] at 237; 521 F.2d at 41; *Blair v. United States Steel Corp.*, 444 F.2d 1390 (3d Cir. 1971).

It is also abundantly clear that Wheeling-Pittsburgh was guilty of non-stevedoring negligence in conjunction with plaintiff's injury in the following particulars: 1) Failure to give adequate safety instructions to steelworkers unfamiliar with river work; 2) Providing a defendant barge for stevedore work; 3) Failing to inspect, repair, or reject the defective barge. Both predicates to a finding of liability against Wheeling-Pittsburgh having been established, its conduct also need only be measured against the appropriate negligence standard.

For the reasons which hereafter follow, American, Wheeling-Pittsburgh in its non-stevedoring capacity, and Wheeling-Pittsburgh in its stevedoring capacity, all breached their duty of exercising reasonable care toward the plaintiff.

In view of our factual determination that negligence was both pervasive and flagrant in the case *sub judice*, we will not dwell on the relationship between plaintiff and the defendants as would be appropriate were the conduct of defendants less extreme. Suffice it to say that under the circumstances of this case, both American and Wheeling-Pittsburgh in its dual identity were negligent to such an extent that recovery for plaintiff would be meritorious regardless of the feudal categorization, except trespasser. Thus, with regard to the

facts *sub judice*, even the most restrictive duty would have found itself breached.

American failed to exercise reasonable care under the circumstances as evidence by the delivery of Barge 2730 to Wheeling-Pittsburgh in a defective condition. Specifically, the barge cover mechanisms were rusted and bent with the eyelets on the stuck cover completely missing. Delivery of such a barge, with knowledge that many workers would necessarily come into contact with the deteriorated barge covers, was inexcusably negligent.[3]

Wheeling-Pittsburgh, as previously noted, was negligent in its non-stevedoring capacity by failing to require the obviously defective barge to be repaired or rejected and by failing to adequately instruct inexperienced river workers, such as plaintiff, on safety rules and proper work procedures. Stevedoring is to engage in the loading or unloading of vessels. It is apparent that Wheeling-Pittsburgh's disregard of its duty to provide a safe work environment for plaintiff was separate from its considerable additional negligence in the actual conduct of stevedoring operations.

In its stevedoring capacity Wheeling-Pittsburgh was negligent in attempting to close the barge covers through use of a crane even though eyelets on the barge covers were missing. An operation under the supervision of experienced rivermen should also have shown better sense than to enlist the aid of a novice in the questionable closing procedure. The prudent solution for Wheeling-Pittsburgh would have been to pursue repair of the barge. The fact that repair at the time of plaintiff's injury may have disrupted "business as usual" is no justification for the blind pursuit of an expedient, but hazardous course of action.

With due consideration for all the evidence and circumstances of the case *sub judice*, this Court holds that American, Wheeling-Pittsburgh in its non-stevedoring

---

**3.** This Court finds American's argument that there was no unreasonable risk of harm created by the defective barge because experienced rivermen were capable of working safely to be singularly unappealing. Experienced rivermen supervised the operation in question and yet the accident still occurred.

capacity, and Wheeling-Pittsburgh in its stevedoring capacity were concurrently negligent in causing plaintiff's injuries.

## DAMAGES

■ Damages sustained by Griffith as a proximate result of defendants' negligence are quite extensive. When the accident occurred, plaintiff landed at the bottom of the barge's hold on his right leg, then toppled onto his left leg. He fell on his right wrist and over onto his back. Medical testimony of record substantiates plaintiff's claim for past and future medical expenses in the amount of $11,672.65.

A second component of plaintiff's damages is past and future wage loss. Plaintiff's wage losses are calculated at a rate of $800.00 per month, the amount which plaintiff was earning in 1973 for Wheeling-Pittsburgh. This Court finds total past wages and future lost wages, reduced to present worth at 6%, supported by evidence of record, to be $42,626.80.

The total figure of $54,299.45 for medical expenses and lost earnings is largely uncontested as to reasonableness. Rather, defendants have chosen to marshal their forces in opposition to liability and the following two additional areas of claimed compensable damages.

■ The first area is plaintiff's claim for impairment of earning capacity. Defendants are required to compensate plaintiff for any lessened ability to earn money in the future as a result of the injuries sustained. It is not the status of the immediate present which determines capacity for remunerative employment. Where permanent injury is involved, the whole span of life must be considered. It must be determined whether or not the economic horizon of the plaintiff has been shortened because of the injuries sustained as a result of defendants' negligence.

■ Evidence of record indicates that plaintiff will never again be able to perform work requiring heavy labor. He is also unable to pursue any occupation which would require standing for long periods of time or extensive movement such as walking. Thus, although Griffith can still perform effectively in many useful careers such as teaching, there are also many tasks which plaintiff is permanently foreclosed from pursuing.[4] Bearing in mind that plaintiff's life expectancy is approximately 41 years, this Court believes that the sum of $80,000 adequately and fully compensates him for the considerable reduction in future employment opportunities caused by his severely restricted mobility and dexterity.

■ Lastly, plaintiff seeks to recover damages for past and future pain, suffering and inconvenience. Following the accident, Griffith suffered from severe pain in the right leg, back, wrist and heel. When he left the hospital, plaintiff had long casts on both legs and his right arm, and was completely bedfast. From May, 1973, to September, 1973, Griffith was confined completely to a stretcher, and was was not permitted to ambulate. From September until November 20, 1973, plaintiff moved about only on platform crutches; in November, 1973, he was permitted to change to a cane, and he has been required to walk with a cane ever since. At the present time, plaintiff continues to be affected by injuries of the right wrist, left heel, spine, chest, right ankle and right leg. As a result of the aforementioned physical restrictions, plaintiff has now also been forced to limit both family and recreational activities. With due regard for plaintiff's 41-year life expectancy and the disabling injuries previously detailed, this Court believes an award of $75,000 to be appropriate for pain, suffering and inconvenience.

---

**4.** Another example would be a trial attorney who suffers the loss of his left hand due to some defendant's negligence. The loss of his left hand would probably not affect the ability of the lawyer to be a skilled advocate. Nonetheless, plaintiff counsel would be entitled to recover for impairment of earning capacity inasmuch as he is now precluded from ever being able to function in a job which requires the use of one's left hand. It is the shortening of the attorney's economic horizon for which damages are awarded and not any actual reduction in earnings.

In total, plaintiff is entitled to compensatory damages in the amount of $209,299.45. It remains to be considered, however, whether or not the equitable credit doctrine should be applied to the damage award.

## EQUITABLE CREDIT DOCTRINE

■ Under the Equitable Credit Doctrine, damages are apportioned among the parties according to the extent of each one's fault. The Court calculates the award by assessing a prorated share of the damages against each party. The parties which would be considered in the case *sub judice* are:

1. Wheeling-Pittsburgh as owner *pro hac vice;*
2. Wheeling-Pittsburgh as stevedore;
3. American Commercial Lines.

The vitality of the equitable credit doctrine is uncertain. As Judge Aldisert stated in *Marant v. Farrell Lines, Inc.*, 550 F.2d 142, 147 (3d Cir. 1977):

". . . the question of a possible credit to the vessel in cases of concurrent stevedore-vessel negligence is, at least in this circuit, very much an open question."

It is in this unsettled context that we address the merits of applying the equitable credit doctrine in the instant case.

The concept of comparative negligence is consistent with Section 905(b) of the Longshoremen's and Harbor Workers' Compensation Act. "Because a literal reading of Section 5(b) creates irreconcilable conflict if the word 'negligence' is understood to mean any negligence at all, some alternative meaning which harmonizes the section must be adopted. This is simply and effectively achieved if 'negligence,' as used in Section 5(b) is recognized as contemplating the extent of fault in addition to its threshold existence. Thus, the first sentence creates a right of recovery for injuries received to the extent such injuries were caused by the vessel, and the third sentence limits the recovery of longshoremen hired directly by the vessel only by the extent that their fellow workers caused the injury. Thus viewed, Section 5(b) is internally consistent and in accord with the general principles of

maritime law." "EQUITABLE CREDIT: Apportionment of Damages According to Fault in Tripartite Litigation Under the 1972 Amendments to the LHWCA," 35 Maryland L.Rev. 353, 369 (1976). Any construction of 905(b) other than one embodying comparative negligence would result in an employee of an independent stevedore recovering full damages from a negligent vessel no matter how little negligent the vessel may have been.

■ The Equitable Credit Doctrine is a method of damage allocation which fosters fairness through the vehicle of proportionate fault. Plaintiff Griffith should not be permitted the double recovery of damages attributable to the negligence of Wheeling-Pittsburgh as stevedore in addition to workmen's compensation. Recovery in the case *sub judice* will therefore be limited to the proportionate damage caused by Wheeling-Pittsburgh in its non-stevedoring capacity and damage attributable to American Commercial Lines.

It is this Court's opinion that American Commercial Lines was 50% negligent, Wheeling-Pittsburgh in its non-stevedoring capacity 25% negligent, and Wheeling-Pittsburgh in its stevedoring capacity 25% negligent. Accordingly, damages are assessed against American Commercial Lines in the amount of $104,649.73 and against Wheeling-Pittsburgh in the amount of $52,324.87. Damages totalling $52,324.87 attributable to the negligence of Wheeling-Pittsburgh in its stevedoring capacity are not recoverable in view of the Equitable Credit Doctrine. Recovery for such negligence takes the form of plaintiff's workmen's compensation payments.

## CONCLUSION

A standard of negligence imposing a duty to exercise reasonable care under all of the circumstances of the case and the equitable credit doctrine are evolving judicial principles not as yet firmly marked with the imprimatur of *stare decisis.* However, one of the foremost responsibilities of any system of jurisprudence is to actively engage

848

in the pursuit of adaptable legal principles appropriate for a changing social environment. Adherence to precedent should not be so talismanic that underlying social policies justifying change are muted. A general negligence standard of reasonable care under the circumstances and the equitable credit doctrine were adopted herein not because they are older than their competing alternatives but because this Court believes they are better. An appropriate Order will issue.