610 F.2d 116
 Thomas W. GRIFFITH
v.
WHEELING-PITTSBURGH STEEL CORPORATION et al.
Thomas W. Griffith, Appellant in No. 78-2159.
Wheeling-Pittsburgh Steel Corporation, Appellant in No. 78-2160.
American Commercial Lines, Inc., Appellant in No. 78-2161.
 Nos. 78-2159 to 78-2161.
 United States Court of Appeals,
Third Circuit.
 Argued June 7, 1979.
Decided Aug. 24, 1979.
 
 Thomas L. Cooper (Argued), Gilardi & Cooper, Pittsburgh, Pa., for Thomas W. Griffith.
 William L. Standish (Argued), Arthur H. Stroyd, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Wheeling-Pittsburgh Steel Corp.
 John W. Jordan, IV (Argued), Thomson, Rhodes & Grigsby, Pittsburgh, Pa., for American Commercial Lines, Inc.
 Before GIBBONS, WEIS and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 Thomas W. Griffith, an employee of Wheeling-Pittsburgh Steel Corporation (Wheeling) commenced this action in August 1973 against his employer, and against American Commercial Lines, Inc. (American), the owner of barge No. 2730, pursuant to § 18(a) of the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972. 33 U.S.C. § 905(b) (1976). He sought damages for injuries sustained on May 26, 1973 when he fell into the hold of barge No. 2730. Both defendants denied liability to Griffith, and each cross-claimed against the other for indemnification and contribution. Both also moved for summary judgment against Griffith and against each other on their respective cross-claims. The district court granted Wheeling's motion for partial summary judgment, dismissing Griffith's negligence claim against Wheeling, and barring any claim for contribution or indemnity by American against Wheeling.[1] The order granting partial summary judgment was entered as a final judgment, and this court then considered appeals by Griffith and American from that order. We reversed and remanded for further proceedings consistent with our opinion.[2]
 
 
 2
 Following a non-jury trial the district court held both Wheeling and American liable to Griffith on a negligence theory. It further found that Griffith had suffered compensatory damages in the amount of $209,299.45, but reduced his recovery by 25% Because it found that 25% Of those damages was attributable to Wheeling's negligence in a stevedoring capacity. On June 15, 1978, the court entered judgment against American for $104,649.73 (50% Of Griffith's damages) and against Wheeling for $52,324.87 (25% Of those damages) a total of $156,974.60.[3] All parties appeal from this final judgment. Once again we must remand for further proceedings.
 
 I. FACTS
 
 3
 The facts respecting Griffith's employment in the Wheeling common labor pool at Allenport, Pennsylvania, his assignment on the day of the accident to work with a barge crew at the river landing, and the happening of the accident are detailed in our previous opinion. That appeal reviewed the summary judgment record. The trial court's findings of fact after the trial confirm that statement in all material respects, and we repeat it here.
 
 
 4
 Appellee Wheeling-Pittsburgh Steel Corporation (Wheeling) operates a steel mill along the banks of the Monongahela River at Allenport, Pennsylvania. It first employed appellant Thomas Griffith on February 11, 1973, about four months before the date of the injury that was to become the subject of this action. He worked out of a common labor pool in the construction department and was assigned on a daily basis to a variety of land-based jobs. On April 1, 1973 Griffith bid into the hot mill labor pool, where as before he was assigned to various jobs on a daily basis. As part of this pool he was assigned to work at the company's barge landing on the river for a total of 33/4 days including the date of the accident on May 26, 1973.
 
 
 5
 On that day, plaintiff was assigned to work with the barge crew at the landing to assist in the loading of two barges. The barge on which the accident was to occur, No. 2730, was owned by defendant-appellant American Commercial Lines, Inc. (American). Three days earlier, on May 23, it had been delivered to Wheeling and was incorporated into the latter's "coal fleet" to await future use. On May 25, No. 2730 was relocated next to the seawall at the barge landing to take on a load of sheet steel which was destined to move down river to Louisville, Kentucky. A second barge, described as a pipe barge, was positioned next to No. 2730, and it too was to be loaded. The pipe barge was positioned immediately next to the seawall, and No. 2730 was lashed alongside further out on the river.
 
 
 6
 On the morning of the day of the accident, Griffith and the regular rivermen in the barge crew first loaded pipe into the pipe barge. During the loading of the pipe barge, which was completed before noon, Griffith worked on the seawall and barge. No. 2730 was then moved into position for loading by a procedure known as "rounding" in which a crane on the seawall pushed the barges away from the wall permitting the current to turn the boats around in the water so that No. 2730 was situated next to the seawall. Griffith's sole assistance during the procedure involved his throwing ropes from one barge to the other.
 
 
 7
 The crew then turned to the loading of No. 2730. At that time, Joseph Allfree, the crew's foreman, who was employed as river foreman by Wheeling, became aware that the barge covers were difficult to move. The wheels and track mechanism on which the covers ordinarily roll were without lubrication and were rusty and bent. At about 2:00 p. m. Allfree directed the crew to stop loading the barge and to close the covers. Allfree then returned to his office away from the area. The only other experienced riverman on the crew, Joseph Armstrong, then had difficulty closing one of the covers. A cable was attached from the crane on the seawall to the cover to pull it shut; a second cable was attached to an adjacent cover for leverage. Because eyelets on the stuck cover were missing, the hook at the end of the cable was attached to the lip on the underside of the cover. Both Armstrong and plaintiff were standing on top of the stuck cover when tension was applied to the cable. As the stuck cover began to rise they stepped back onto an adjacent cover, but that cover moved backward and the two men fell into the hold and both were injured.
 
 
 8
 521 F.2d at 34-35.
 
 II. GRIFFITH'S APPEAL
 
 9
 Griffith's appeal contests the reduction of his recovery to $156,974.60. Griffith's § 905(b) claims were against the barge owner, American, on the theory that it had negligently furnished Wheeling a defective barge, and against Wheeling as owner Pro hac vice for negligently directing him to work on that unsafe barge. As noted, the trial court found in Griffith's favor on both of these claims. Both Wheeling and American contest liability to Griffith, and their contentions are addressed in Parts III and IV below. But neither contests the district court's finding of fact that Griffith suffered $209,299.45 in compensatory damages. Nor does either contend that Griffith, himself, was guilty of any negligence which contributed to the accident. In this Part we address the reduction of Griffith's damages on the assumption that the trial court's liability determinations in Griffith's favor are correct.
 
 
 10
 The court found that American was negligent in delivering a barge with defective cover mechanisms, knowing that workers such as Griffith would be exposed to risk of injury for those defects. It found that Wheeling, in its capacity as owner Pro hac vice of the barge, was negligent in failing to give adequate instructions to steelworkers unfamiliar with river work, in providing a defective barge for such work, and in failing to inspect, repair, or reject the defective barge. It also found that in its stevedoring capacity, as distinguished from its capacity as owner Pro hac vice, Wheeling was liable for the negligence of its employees, Griffith's fellow servants. The court allocated the responsibility for Griffith's injuries 50% To American, 25% To Wheeling as owner Pro hac vice, and 25% To Wheeling as stevedore. It then applied what has become known as the equitable credit doctrine to reduce Griffith's total recovery by 25%, representing the negligence attributable to his employer, Wheeling, acting in its capacity as stevedore.
 
 
 11
 In adopting the equitable credit doctrine the trial court decided the question which this court expressly reserved in Marant v. Farrell Lines, Inc., 550 F.2d 142, 147 (3d Cir. 1977). The theory behind that doctrine was that when Congress in the 1972 Amendments to the LHWCA eliminated the shipowner's strict liability to longshoremen for unseaworthiness, and at the same time created in § 905(b) a new negligence cause of action against the shipowner, it did not intend to impose liability upon the shipowner for that part of the longshoreman's damages attributable to the negligence of the longshoreman's employer. The workman's compensation remedy was said to cover that percentage of the damages. This statutory compensation was characterized as equitable in recognition of the fact that under § 933(c) of the Act the stevedore employer had a lien on the employee's third party recovery. Thus, in the absence of a credit principle, the stevedore might in some cases be fully repaid for its workmen's compensation payments by the shipowner, although its own employees were significantly responsible for the injury. The shipowner would then be left to bear the burden of the longshoreman's damage recovery, despite its lesser responsibility. It was thought to be equitable to prevent this result by reducing the longshoreman's negligence recovery in proportion to the percentage of the stevedore's negligence.
 
 
 12
 In Edmonds v. Compagnie Generale Transatlantique, --- U.S. ----, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), the Supreme Court reversed an En banc decision of the Fourth Circuit[4] which had applied the equitable credit doctrine to reduce a negligence recovery in a § 905(b) action against a shipowner by a percentage equal to the proportionate fault of the longshoreman's employer. The Court held that Congress did not intend to modify the longshoreman's pre-existing right to recover for his injuries in full against a negligent shipowner, even in cases where the negligence of the stevedore contributed to the injury. Whatever the conduct of the longshoreman's employer, a negligent shipowner is liable for the full amount of the longshoreman's damages. Justice White for the Court recognized that by virtue of the stevedore employer's compensation lien on the employee's third party recovery the Edmonds result may relieve a negligent stevedore even of the burden of statutory compensation payments, at ----, 99 S.Ct. 2753, but found that circumstance was not decisive. So much for equitable credit.
 
 
 13
 Thus unless both Wheeling and American can prevail in their appeal on liability issues, a judgment must be entered in favor of Griffith against one or both in the full amount of $209,299.45.
 
 III. AMERICAN'S APPEAL AGAINST GRIFFITH
 
 14
 The district court held that American, as owner, had breached its duty to exercise reasonable care by delivering barge No. 2730 to Wheeling with its cover mechanisms rusted, bent, and unlubricated, and with the eyelets on the stuck hatch cover completely missing. The court concluded that "(d)elivery of such a barge, with knowledge that many workers would necessarily come into contact with the deteriorated barge covers, was inexcusably negligent." 452 F.Supp. at 845.
 
 
 15
 In reaching this conclusion, the trial court considered at some length the applicable standard of care. It recognized that some prior cases[5] had relied upon §§ 343-343A of the Restatement (Second) of Torts (1965), dealing with the liability of landowners and occupiers, as defining the standard of care applicable to vessel owners under § 905(b) of the Amendments.[6] It concluded, however, that the application of that formulation would introduce into the maritime torts area distinctions between licensees and invitees which would be inappropriate in the context of commercial shipping. Relying on the Supreme Court's decision in Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959), the court discerned an emerging trend in the law toward imposing upon property owners a more general "duty to exercise reasonable care under all the circumstances of the case." 452 F.Supp. at 844. The court also observed that in most cases, including the case Sub judice, the same result would be reached whether one applied the Restatement § 343 formulation or the more universal duty to exercise reasonable care under all the circumstances. The court therefore concluded that the latter standard was the proper one to apply.
 
 
 16
 On appeal, American urges that the standard adopted by the district court "leads to an improper imposition of liability in this case and provides no real guidance for the decision of future cases." We are less concerned with the latter objection than with the former, and we conclude that the facts found by the trial court justify imposition of liability on the vessel owner in this case.
 
 
 17
 A brief review of this court's prior decisions discussing the standard of care under § 905(b) will serve as background for our review of the district court's decision. In Griffith I, supra, we pointed out, first, that the clear intent of amended § 905(b) was to relieve vessel owners of absolute liability for injuries to stevedores, whether that liability was imposed on the basis of unseaworthiness or on a Respondeat superior theory. 521 F.2d at 40. At the same time, we recognized the apparent intention of Congress "to apply land-based common law negligence principles on a uniform national basis" in actions against the vessel owner under § 905(b). Id. at 44 & n.21. We did not at that time undertake to specify the principles to be applied to the record on remand.
 
 
 18
 This court's subsequent decisions have concentrated upon clarifying the implications of Congress' rejection in § 905(b) of strict or Respondeat superior liability as a basis for recovery against the vessel owner. In Brown v. Ivarans Rederi A/S, 545 F.2d 854 (3d Cir. 1976), Cert. denied, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977), we concluded that § 416 of the Restatement (Second) of Torts, which imposes a non-delegable duty of due care upon persons employing a contractor to perform work "dangerous in (the) absence of special precautions" was inconsistent with the intent of Congress to eliminate shipowner liability without fault. Similarly, in Marant v. Farrell Lines, Inc., supra, we reversed a judgment for the longshoreman, because the jury had been instructed that "responsibility for the safety of the longshoreman lies concurrently or jointly" with the stevedore and the shipowner. Relying on Brown, we held that "the major responsibility for the proper and safe conduct of the work was to be borne by the stevedore." 550 F.2d at 144 (quoting Brown, supra, 545 F.2d at 860). And in Hurst v. Triad Shipping Co., 554 F.2d 1237 (3d Cir.), Cert. denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), we held that §§ 318 and 416-429 of the Second Restatement were inapplicable in a § 905(b) action, again on the basis that each would have resulted in the imposition upon the shipowner of liability without fault. We held that § 414 of the Restatement, which permits imposition of liability upon a principal who retains control over some part the work performed by an independent contractor, and who fails to exercise that control with reasonable care, might provide a proper basis for liability under § 905(b), but concluded that the plaintiff had failed to introduce sufficient evidence of the shipowner's control over the stevedore's operation to support a recovery. 554 F.2d at 1252.
 
 
 19
 Rich v. United States Lines, 596 F.2d 541 (3d Cir. 1979), relied on by American at oral argument, continues the pattern of our earlier decisions. In Rich the plaintiff longshoreman was injured when he slipped on sheet ice which had accumulated on top of containers stacked on board the defendant's vessel. The panel first held that plaintiff's evidence was insufficient as a matter of law to support liability under § 414 of the Restatement. Id. at 550. The plaintiff, relying upon the legislative history of the Amendments, also argued that the shipowner had breached its duty to provide a "safe place to work" by failing to take appropriate corrective action, despite its knowledge of the dangerous ice conditions. In a discussion closely tailored to the facts of the case, the panel majority rejected this contention on the ground that the plaintiff had failed to establish that the ice covered containers were a part of the ship for whose condition the shipowner was customarily responsible. In the panel's view, the evidence in the case showed "Beyond a doubt " that the stevedoring company, rather than the vessel, was "In complete charge of the details of handling of the containers." Id. at 557 (emphasis added). To impose liability on those facts, the court concluded, would "amount once again to the establishment of a nondelegable duty." Id. at 556 (citing Hurst v. Triad Shipping, supra, 554 F.2d at 1251). The panel majority's view of the case made it unnecessary for them to consider the standard of care issue.
 
 
 20
 These decisions firmly establish that under § 905(b):
 
 
 21
 (T)he vessel has no general duty continually to supervise the activities of the stevedore, to assume responsibility for the stevedore's equipment, or to assume responsibility for dangerous conditions in the vessel created by the stevedore during the course of its operations (at least when the vessel has no knowledge of the dangerous conditions).
 
 
 22
 Rich v. United States Lines, Inc., supra, 596 F.2d at 560 (Garth, J., concurring) (footnote omitted). They do not, however, speak directly to the scope of the vessel's independent duty under § 905(b) to "exercise the same care as a land based person in providing a safe place to work."[7]
 
 
 23
 American presents two arguments against the standard of reasonable care under all the circumstances applied by the district court. First, it argues that a vessel should not be held liable in negligence under § 905(b) if it has delivered the ship "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter" will be able to load or unload the vessel safely by exercising "ordinary care under the circumstances."[8] Alternatively, American urges this court to adopt the standard of care established in Restatement (Second) §§ 343-343A to govern all actions under § 905(b).
 
 
 24
 We reject both suggestions. Under American's first proposed standard of care the vessel would be relieved of liability to a longshoreman for unreasonably dangerous conditions on board ship whenever the stevedoring contractor failed to perform his tasks in an "expert and experienced" fashion. This would occur whether or not the individual longshoreman was personally at fault. The proposed rule thus imputes to the non-negligent longshoreman the negligence of his stevedore employer, and establishes that negligence as a complete bar to recovery against the vessel. This result is at variance with the Supreme Court's interpretation of the 1972 Amendments in Edmonds v. Compagnie Generale Transatlantique, supra. It is inconceivable to us that the Court, which disapproved a rule that imputes the negligence of the stevedore to the longshoreman to Reduce his recovery against a negligent shipowner, would approve a rule barring all recovery against a negligent shipowner on the basis of imputed employer negligence. We do not hold that the likelihood of negligent conduct on the part of the stevedoring contractor is always irrelevant in determining whether the vessel has breached its duty of due care. Compare Restatement (Second) of Torts § 302A[9] With id. § 302. But the fact that the stevedore has been negligent cannot be automatically decisive of that question.
 
 
 25
 Similarly, we cannot agree that §§ 343 and 343A of the Second Restatement define for all cases the appropriate standard of care under § 905(b). It is true, as American points out, that we have approved reference to the Restatement (Second) in § 905(b) negligence actions "as the national expression of non-maritime tort principles." Hurst v. Triad Shipping Co.,554 F.2d at 1248; Brown v. Ivarans Rederi A/S, 545 F.2d at 863. But as Hurst itself illustrates, those provisions are adopted only when they are consistent with Congressional intent in enacting § 905(b). Sections 343 and 343A do not meet that standard. Both sections would apparently relieve a vessel owner of all liability for an unreasonably dangerous condition on board ship if the invitee longshoreman has failed to exercise ordinary care in dealing with that danger, on the theory that a negligent invitee has assumed the risk of injury. See § 343A, Comment e. As we stated in Hurst, 554 F.2d at 1250, Brown, 545 F.2d at 863-64 n.10, and Rich, 596 F.2d at 551 n.21, that principle is inconsistent with the clearly stated intention of Congress to abolish the doctrines of contributory negligence and assumption of risk in cases decided under § 905(b).[10]
 
 
 26
 More fundamentally, we think that it would be unwise to assume that the principles of negligence law applicable to owners of land will in all cases provide an appropriate "land based" standard of care for actions against a vessel owner. In some cases the analogy will be appropriate. In other cases, different portions of the Restatement, including, for example, the duty of care owed by a supplier of a chattel in commerce, may provide a more appropriate standard of reference. Cf. Restatement (Second) of Torts §§ 388-389. Indeed, it might persuasively be argued that it was the latter duty which was breached in this case. Moreover, we agree with the district court that insofar as the standards of liability in §§ 343 and 343A are colored by traditional economic and social attitudes uniquely associated with land ownership, wholesale importation of those sections into § 905(b) might be confusing and counterproductive. See Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); Santos v. Scindia Steam Navigation Co., 598 F.2d 480, 486-88 (9th Cir. 1979); Gallardo v. Westfal-Larsen & Co. A/S, 435 F.Supp. 484, 493-95 (N.D.Cal.1977); Espinoza v. United States Lines, Inc., 444 F.Supp. 405, 409-12 (S.D.N.Y.), Aff'd, 586 F.2d 832 (2d Cir. 1978); G. Gilmore & C. Black, The Law of Admiralty 453-54 (2d ed. 1975).
 
 
 27
 The sounder approach, we think, is to recognize that § 905(b) imposes on vessel owners the same duty to exercise "reasonable care under the circumstances of each case" that would be applicable to a land based business. Accord, Santos v. Scindia Steam Navigation Co., 598 F.2d at 485-88; Gallardo v. Westfal-Larsen & Co. A/S, 435 F.Supp. at 496. See Kermarec v. Compagnie Generale Transatlantique, 358 U.S. at 632, 79 S.Ct. 406; Brown v. Ivarans Rederi A/S, 545 F.2d at 863. Cf. Restatement (Second) of Torts §§ 281-283, 302A, 305, 452. Proceeding from this broad common law standard, federal courts may develop on a case by case basis a uniform federal law of negligence, referring for guidance to the "land based" standards of care established in the Restatement (Second) of Torts whenever such reference accords with the Congressional intent and is helpful to decision of the case at hand.
 
 
 28
 At a minimum, we think that the standard of reasonable care under the circumstances would permit a finding of negligence upon a showing: (1) that the vessel knew of or by the exercise of reasonable care could have discovered the condition on board ship that led to the injury; (2) that the vessel knew or should have known that the condition would pose an unreasonable risk of harm to longshoremen working on board ship; and (3) that the vessel failed to exercise reasonable care to protect the longshoremen against that danger. See Santos v. Scindia Steam Navigation Co., 598 F.2d at 485.[11]
 
 
 29
 Reviewing the record in this case, we think that the district court's application of the standard of reasonable care under all the circumstances of this case touched all of these bases. Certainly, there was ample evidence to support the court's conclusion that American knew or should have known of the rusted, decrepit condition of the covers on barge No. 2730, and that American failed to exercise reasonable care to correct that condition. American does not argue otherwise. Rather the substance of American's argument is that the evidence was insufficient to show that it knew or should have known that the condition of the barge posed an unreasonable risk of harm to longshoremen in Griffith's position. Specifically American contends that the difficulty with the stuck covers was obvious and could have been solved without danger to anyone, and that therefore American should not have been required to anticipate that Wheeling would attempt to overcome the defect in the covers by the unsafe method to which it resorted.
 
 
 30
 In pressing this argument American attacks both the factual and legal findings of the court below. American points to the district court's reference to missing eyelets to which the hook which Griffith was holding could have been attached, and argues that that finding is clearly erroneous. In fact, the record shows that there were two eyelets on the covers, one close to each side of the barge (Exhibit D2). But the uncontradicted trial testimony was that Wheeling's employees had tried ten or twenty times without success to unstick the barge covers by attaching cables to those eyelets. (224a-225a; 313a-314a). The missing eyelets to which the court referred would have been at the center of the covers, where they could have been grasped in a balanced manner by the crane cables. Because such eyelets were missing or had never been installed, Wheeling's employees had to remain on the cover, holding the cable hooks under the rim of the cover, while tension was applied.
 
 
 31
 American also argues that there were alternative methods available to Wheeling-Pittsburgh by which the covers might have been moved safely, which it was entitled to assume that Wheeling would rely upon. One safe alternative method which American suggests is the use of the outboard eyelets on the covers, a method which the testimony discloses was tried and which, due to the defective condition of the barge, proved ineffective. William Toutant, the designer of barge No. 2730, also testified that with the use of a four part sling the covers, which weigh over nine thousand pounds, could have been lifted off safely. (393a). But Frank Merritt, an American employee, was aware, before barge No. 2730 was furnished to Wheeling, that at Allenport Wheeling regularly used the double cable method of moving stuck barge covers. (41a). Thus when American furnished barge No. 2730 it knew or should have known that the combination of the unlubricated, rusty, and bent track mechanism and the missing center eyelets would expose Wheeling's longshoremen to the precise sort of risk to which Griffith was exposed. The fact that Wheeling's chosen method of operation may have been negligent is therefore of no help to American.[12]
 
 
 32
 The record before the district judge contained substantial evidence that American knew of the condition on board its vessel; that it knew or should have known that that condition posed an unreasonable risk to workers in Griffith's position; and that it failed to correct that condition. On this record, then, we hold that the district court's findings of fact with respect to American's liability to Griffith are not clearly erroneous, and that its application of a general standard of reasonable care in the circumstances was not legal error.
 
 IV. WHEELING'S APPEAL AGAINST GRIFFITH
 
 33
 Wheeling does not contest that, if it was properly held to be an owner Pro hac vice, it was guilty of negligence in that capacity. But it contends that the judgment against it in favor of Griffith must be reversed because as a matter of law it is not an owner Pro hac vice. An appreciation of that argument requires an examination of the complex procedural history of this case. As we indicated above, the trial court in 1974 granted Wheeling's motion for summary judgment against Griffith. In doing so it accepted Wheeling's argument that even assuming its alleged status as an owner Pro hac vice, the LHWCA precluded liability against it in favor of an employee. 384 F.Supp. at 237. Since that legal theory rendered its ownership status immaterial, Wheeling argues, it did not file affidavits contesting that status in support of its motion for summary judgment. On appeal this court, accepting as undisputed Wheeling's exclusive though temporary control of barge No. 2730, rejected its legal position that the LHWCA barred recovery against it as an owner Pro hac vice. As we explained: "Wheeling concedes that it might be found to be an 'owner pro hac vice' as that term has been applied in this circuit." 521 F.2d at 39-40 (footnote omitted). Thus, our reversal of summary judgment in Wheeling's favor established no more than that based on the pleadings, affidavits, and discovery materials then on file, a factfinder could find Wheeling to be a Pro hac vice owner within the meaning of Blair v. United States Steel Corp., 444 F.2d 1390 (3d Cir. 1971) (per curiam), Cert. denied, 404 U.S. 1018, 92 S.Ct. 681, 30 L.Ed.2d 666 (1972).
 
 
 34
 Wheeling now points out that there is substantial additional evidence in the record concerning its relationship to barge No. 2730 which was not of record at the time of the summary judgment. That evidence, it contends, establishes that it was not a Pro hac vice owner as defined in Blair. It contends, moreover, that the trial court, in misplaced reliance on the law of the case doctrine, disregarded that additional evidence in holding it liable. Finally, it contends that even if the Blair standard as to Pro hac vice ownership has been met, that case should be overruled.
 
 
 35
 When the case was first before us it was undisputed, and still is after trial, that barge No. 2730 was delivered to Wheeling's Allenport landing by a river boat company, and incorporated into a fleet there under the supervision of Joseph Allfree, Wheeling's river dock foreman. From the time Wheeling received the barge until the time of the accident it had exclusive possession. All movements of the barge while it was in Wheeling's possession were the responsibility of Wheeling's employee rivermen. Their duties included placing lights on the barges moored with Wheeling's fleet and moving them about the landing to facilitate loading. Barge No. 2730 was one of a number furnished to Wheeling for transportation of its products, and it was free to choose which among them it would use. These undisputed facts fit squarely with the Blair holding. Wheeling does not contend that any available evidence bearing on its relationship to barge No. 2730 was excluded at trial. Rather, it points to additional evidence introduced at trial, as follows:
 
 
 36
 (Wheeling) could load only material destined for a pre-determined port (350a); the charter between (Wheeling) and American was oral rather than written (7a, 337a, 566a); Barge 2730 could have been removed by American for repairs without (Wheeling's) prior permission (355a-356a); (Wheeling) was not responsible for rent on American barges which were unavailable due to repair (358a); (Wheeling) paid American for Barge 2730 according to tonnage shipped rather than type of barge used (449a, 564a); (Wheeling) had nothing to do with the route or time which Barge 2730 took to arrive at its final destination (565a, 349a); and (Wheeling) could not move Barge 2730 from its landing without (American's) consent and without the assessment of an additional fee. (354a, 358a) (ICC Waterways Freight Tariff, 8-B, Items 420-435)
 
 
 37
 Wheeling's Brief in No. 76-2160 at 12. Wheeling argues that because the trial court relied on the law of the case doctrine it disregarded this trial evidence. Because the record is not clear on this issue, we must remand for further factual findings.
 
 The trial court found after trial that:
 
 38
 The status of (Wheeling) as owner Pro hac vice at the time of the injury is well established under Both the law of the case And the applicable case law.
 
 
 39
 452 F.Supp. at 845 (emphasis added). Since evidence on the issue of Wheeling's relationship to barge No. 2730 was received, and the court nowhere denied considering it, the quoted language could be understood as a finding upon all the evidence presented, that Wheeling fell within the definition of Pro hac vice owner announced in Blair and in Griffith I. On the other hand, it may be read as relying solely on the holding in Griffith I to determine the issue of ownership status. There are a number of indications in the record that the district judge may well have erroneously viewed our decision in Griffith I as foreclosing any factual inquiry into Wheeling's ownership status on remand. See 340a; 341a; 342a. Because we are unable to determine from the record whether the district judge actually considered the further evidence bearing on ownership status submitted by Wheeling, and because Wheeling was entitled to have the district judge pass on that evidence before he determined its ownership status, a remand is required for further findings of fact on that issue.
 
 
 40
 We reject, however, Wheeling's further contention that Blair and Griffith I should be overruled. In the first place that would require action by the court in banc. Nor is this panel persuaded that the Blair holding should be reconsidered.[13] Wheeling argues that that holding imposes an inconvenience upon barge users who operate their own landings and perform their own stevedoring. That may be, but such barge customers also undoubtedly obtain substantial cost and convenience advantages from doing so. If the barges remained in the possession and control of an owner's crew, that crew would supervise use of the barge at the landing and might possibly guard against injuries to longshoreman invitees. But the bargeline customer would be charged accordingly. When that customer chooses to take exclusive possession and control of a barge in navigation, even for a limited time and in a limited space, it should, as we have held, be obliged to discharge the responsibilities of an owner. Another experienced admiralty court agrees. See Eskine v. United Barge Co., 484 F.2d 1194 (5th Cir. 1973).
 
 
 41
 Wheeling also contends that the trial court erred in finding that it was negligent, in its capacity as owner Pro hac vice, in failing adequately to train steelworkers unfamiliar with river work. That contention bears upon the allocation of liability between Wheeling and American. It does not, however, affect Wheeling's liability to Griffith, since findings that Wheeling was negligent as owner Pro hac vice in providing a defective barge, and in failing to inspect, repair or reject it, are not challenged as factually or legally erroneous.
 
 
 42
 Thus we hold that the judgment of liability in favor of Griffith against Wheeling as owner Pro hac vice must be vacated and remanded for further findings regarding Wheeling's status as owner.
 
 V. WHEELING'S APPEAL AGAINST AMERICAN
 A. Indemnification
 
 43
 Wheeling also appeals from the district court's rejection of its claim against American for indemnification. While a factual finding in the district court that Wheeling was not an owner Pro hac vice would moot this claim, we think that in light of the possibility that the issue of contribution or indemnity is not foreclosed by our remand, resolution of this question is proper on this record.
 
 
 44
 Wheeling contends that when a demise charterer an owner Pro hac vice and an owner are both found to be negligent with respect to any injury-causing defect, the negligence of the owner in supplying the defective barge is active or primary, while that of the owner Pro hac vice, in failing to discover and remedy the defect is passive or secondary. A tortfeasor who is only secondarily or passively negligent, it urges, is entitled to indemnification for any loss occasioned by the primary or active negligence of another. It points out that such a non-contractual duty by a primary or active tortfeasor to indemnify a secondary or passive tortfeasor has been recognized both by Pennsylvania law, E. g., Builders Supply Co. v. McCabe, 366 Pa. 322, 77 A.2d 368 (1951); Tromza v. Tecumseh Products Co., 378 F.2d 601 (3d Cir. 1967), and in maritime cases. E. g., Tri-State Oil Tool Indus., Inc. v. Delta Marine Drilling Co., 410 F.2d 178 (5th Cir. 1969); Standard Oil Co. v. Robins Dry Dock & Repair Co., 32 F.2d 182 (2d Cir. 1929).
 
 
 45
 We reject at the outset Wheeling's suggestion that rights of indemnity and contribution between maritime joint tortfeasors should be governed by state law. Consistent with the intent of Congress in enacting the 1972 Amendments, we think that whatever rule is adopted should be uniform and federal. Brown v. Ivarans Rederi A/S, 545 F.2d at 861-63; Griffith I, 521 F.2d at 44 & n.21. Moreover, while we recognize that the federal cases cited by Wheeling might once have had some force, we think that the law of maritime indemnity has been substantially altered by the Supreme Court's decision in United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). In that case the Court abandoned the traditional rule of "divided damages" for maritime collision cases. That rule required "the equal division of property damage whenever both parties are found to be guilty of contributing fault, whatever the relative degree of their fault may have been." 421 U.S. at 397, 95 S.Ct. at 1709. In the future, the Court held, collision damages should be apportioned on a comparative fault basis. The rationale behind that decision was simple: allocation of liability directly in proportion to fault was a much fairer method of determining damages than the rough and ready 50-50 division imposed by the traditional rule.
 
 
 46
 The rule of non-contractual indemnity pressed by Wheeling, like the contribution rule at issue in Reliable Transfer, is designed to shift the primary burden of reparations to the party more at fault, thereby avoiding unjust, or at least unsatisfactory results. But the rule performs that task by relieving a concededly negligent tortfeasor albeit his negligence was "passive" from Any liability for the damage that occurred. That result seems strongly at odds with the preference for comparative fault expressed in Reliable Transfer. A similar rule, formerly applied in maritime collision cases, held that when one ship's negligence was "major," and the other's "minor," the grossly negligent party could be held solely at fault. E. g., The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84 (1893). The Reliable Transfer Court dismissed this rule as "inherently unreliable" and unfair. "That a vessel is primarily negligent does not justify it shouldering all responsibility, nor excuse the slightly negligent vessel from bearing any liability at all." 421 U.S. at 406, 95 S.Ct. at 1713. Similarly, we can see no good reason why in this non-collision maritime context the fact that Wheeling's conceded negligence as owner Pro hac vice may have been less egregious than that of American should justify the creation of a right of indemnity which would impose sole responsibility for the accident on American, while allowing Wheeling to go scot-free. In Griffith I, supra, we suggested that the preferable approach would be to apply the comparative fault principles endorsed in Reliable Transfer to achieve an equitable apportionment of liability between the two alleged joint tortfeasors. The district court applied those principles here, and we affirm that application.
 
 
 47
 Thus we hold that the district court properly rejected Wheeling's claim that it should be fully indemnified by American for its liability to Griffith.
 
 B. Percentage of Negligence
 
 48
 The trial court, as we noted above, entered judgment against Wheeling for $52,324.87 and against American for $104,649.73, because it held that Wheeling as owner Pro hac vice was responsible for 25%, and American for 50% Of the total damages of $209,299.45. In Part I we held that it was improper to diminish Griffith's recovery by a percentage equal to Wheeling's stevedore negligence. If the court determines on remand that Wheeling is an owner Pro hac vice, the defendants are jointly and severally liable under § 905(b) for the full amount of Griffith's damages. That holding would require a redetermination of the amount for which each defendant is liable. According to the district court, negligence actionable under § 905(b) produced 75% Of the damages, of which 50% Was attributable to American and 25% To Wheeling. The court's findings suggest that on remand contribution in the ratio of two thirds-one third would be appropriate. Thus, if the findings upon which the 50%-25% Allocation was based were sustainable it would be a simple matter to calculate the contribution of each defendant toward the $209,299.45 joint liability.
 
 
 49
 Unfortunately, however, we are not in a position to make that simple calculation. As we noted above, the trial court predicated its finding of negligence by Wheeling as owner Pro hac vice in part on Wheeling's "(f)ailure to give adequate safety instructions to steelworkers unfamiliar with river work." 452 F.2d at 845. Wheeling notes that there is a serious problem of proximate cause with respect to that finding, since in the same accident which injured the untrained Griffith, his supervisor, Joseph Armstrong, a well-trained and experienced riverman, was also injured. More fundamentally, Wheeling observes, and we agree, that on this record, its failure to train Griffith and his fellow servants was, insofar as it contributed to his injuries, a failure to train them in longshoreman skills. That failure must as a matter of law be attributed to Wheeling in its capacity as a stevedore rather than as an owner Pro hac vice. "The only negligence of (Wheeling) which could properly be . . . attributed to Wheeling (as owner Pro hac vice ) was its negligence in failing to inspect, reject, or correct (b)arge 2730." Appellant's Brief in No. 78-2160 at 25. Since the trial court did not disclose to what extent its finding of 25% Culpability was attributable to Wheeling's failure to train, we cannot recalculate the allocation between Wheeling and American for purposes of contribution. A remand is necessary so that the trial court can make that determination, excluding from the calculation Wheeling's negligence in failing to train.
 
 VI. AMERICAN'S APPEAL AGAINST WHEELING
 
 50
 American objects to the allocation of liability between it as owner and Wheeling as owner Pro hac vice on the basis of 50%-25%. It urges that since the duties of an owner and an owner Pro hac vice are the same, their liabilities should be the same unless some special circumstance alters the balance. We readily grant that the duties to third parties of an owner and an owner Pro hac vice are the same, with respect to the condition of the vessel. Both are required to exercise reasonable care under all the circumstances of the case. But it does not follow that because their duties are the same and each breached those duties in some manner their liability Inter sese for a joint tort should be the same. What we have said in Part V-A. above about the applicability of the principles of Reliable Transfer is equally applicable here. When two acts of negligence concur in causing injury, contribution should be allocated on a comparative fault basis. The trial court heard the testimony and made a factual determination as to comparative fault which, except to the extent discussed in Parts IV and V-B. above, we cannot find clearly erroneous. Our decision in Part V-B. above requires a redetermination of the percentage of contribution, excluding one of the factors on which the trial court relied.
 
 VII. CONCLUSION
 
 51
 The judgment appealed from will be modified so as to provide that American as owner is jointly liable to Griffith for $209,299.45. The judgment will be vacated, insofar as it determines that Wheeling was liable as an owner Pro hac vice, and the case remanded for a redetermination, on all the evidence presented, of Wheeling's ownership status. If Wheeling is held to be an owner Pro hac vice, then the court should redetermine the liability of each defendant consistent with Part V-B. of this opinion. Costs shall be taxed in favor of Griffith against American, but Wheeling and American shall between themselves each bear their own costs.
 
 
 
 [1]
 Griffith v. Wheeling-Pittsburgh Steel Corp., 384 F.Supp. 230 (W.D.Pa.1974)
 
 
 [2]
 Griffith v. Wheeling-Pittsburgh Steel Corp., 521 F.2d 31 (3d Cir. 1975), Cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976) (Griffith I ). The Griffith I court affirmed the district court's holding that Griffith was not a Jones Act seaman, and therefore had no Jones Act remedy against either defendant. 521 F.2d at 36-38
 
 
 [3]
 Griffith v. Wheeling-Pittsburgh Steel Corp., 452 F.Supp. 841 (W.D.Pa.1978)
 
 
 [4]
 Edmonds v. Compagnie Generale Transatlantique, 577 F.2d 1153, 1155-56 (4th Cir. 1978) (En banc )
 
 
 [5]
 E. g., Lubrano v. Royal Netherlands Steamship Co., 572 F.2d 364 (2d Cir. 1978); Gay v. Ocean Transport & Trading Ltd., 546 F.2d 1233 (5th Cir. 1977); Anuszewski v. Dynamic Mariners Corporation, Panama, 540 F.2d 757, 759 (4th Cir. 1976) (per curiam), Cert. denied, 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977)
 
 
 [6]
 Those sections read as follows:
 § 343. Dangerous Conditions Known to or Discoverable by Possessor
 A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
 (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
 (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
 (c) fails to exercise reasonable care to protect them against the danger.
 § 343A. Known or Obvious Dangers
 (1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.
 (2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.
 
 
 [7]
 H.R.Rep.No.92-1441, 92d Cong., 2d Sess., Reprinted in (1972) U.S.Code Cong. & Ad.News, 4698, 4704 (hereinafter cited as House Report )
 
 
 [8]
 American Brief at 14 (quoting Hugev v. Dampskisaktieselskabet International, 170 F.Supp. 601 (S.D.Cal.1959), Aff'd sub nom., Metropolitan Stevedore Co. v. Dampskisaktieselskabet International, 274 F.2d 875 (9th Cir.), Cert. denied, 363 U.S. 803, 80 S.Ct. 1237, 4 L.Ed.2d 1147 (1960))
 
 
 [9]
 Section 302A reads:
 An act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person.
 
 
 [10]
 See House Report, supra note 7, (1972) U.S.Code Cong. & Ad.News
 
 
 [11]
 Compare Restatement (Second) of Torts, §§ 343(a)-(c) With id. §§ 388(a), (c)
 
 
 [12]
 See Restatement (Second) of Torts § 302 Quoted supra at note 9
 
 
 [13]
 Judge Weis believes that Blair should not be extended but should be limited to its facts, and that the burden of establishing a demise charter rests upon the owner of the vessel. See Guzman v. Pichirilo, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962); Leary v. United States, 14 Wall. 607, 81 U.S. 607, 612, 20 L.Ed. 756 (1871); Dobbins v. Crain Bros., 567 F.2d 559 (3d Cir. 1977); Fitzgerald v. A. L. Burbank, 451 F.2d 670, 676 (2d Cir. 1971); Miller v. Union Barge Line Corp., 299 F.Supp. 718 (W.D.Pa.1969)