**Carmen DI RAGO and Joan Di Rago, his wife,**

v.

**AMERICAN EXPORT LINES, INC., Appellant.**

No. 80–1317.

United States Court of Appeals, Third Circuit.

Argued Oct. 17, 1980.

Decided Feb. 17, 1981.

As Amended Feb. 27, 1981.

James A. Yulman, (argued), Timothy J. Mahoney, Krusen, Evans & Byrne, Philadelphia, Pa., for appellant.

Avram G. Adler, (argued), Stanley Paul Kops, Despina C. Marsella, Adler, Barrish, Daniels, Levin & Creskoff, Philadelphia, Pa., for appellee.

Before GIBBONS and ROSENN, Circuit Judges, and WEBER, District Judge.*

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Carmen DiRago, an employee of an independent contractor stevedore company, I.T.O. Corp. ("I.T.O."), brought this action against American Export Lines ("Export"), the owner of the S. S. EXPORT AGENT, pursuant to § 18(a) of the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972 ("LHWCA"). 33 U.S.C. § 905(b) (1976). He sought damages for injuries sustained while working aboard the EXPORT AGENT discharging rolls of carpet backing. Plaintiff alleged that negligent stowage of the rolls was the proximate cause of his injuries; and after trial to a jury, special interrogatories were returned finding the defendant vessel owner liable and the plaintiff 5% contributorily

---

* Hon. Gerald J. Weber, United States District Judge for the Western District of Pennsylvania, sitting by designation.

negligent. The parties thereafter stipulated as to damages–and this appeal followed.

Export does not challenge the jury's finding that it was negligent in permitting the improper stowage. Rather, it defends on the ground that the stevedore crew's failure to remove or avoid the danger to DiRago, once it discovered the hazardous condition of the stowage, constitutes a superseding cause of his injuries, thereby relieving Export of any liability. The sole issue presented for review then is whether the trial court erred in refusing to charge the jury on superseding cause. Because we find the instructions of the trial court on proximate cause adequate, and do not believe complete discharge of the shipowner's duty under the facts of this case is warranted by either legislative mandate or judicial decision, we affirm the judgment of the court below.

The facts at trial showed negligence on the part of both the stevedore crew and the vessel owner:

On the accident date, DiRago was working with his gang foreman, William Collins, and his fellow holdman, Stephen Pakech, in the No. 3 lower 'tween deck of the S. S. EXPORT AGENT, while it was moored at I.T.O.'s Tioga Terminal in Philadelphia. The cargo of carpet backing was divided into two approximately equal sections, one in the port wing and the other in the starboard wing. The center portion of the hatch was clear of cargo, with the exception of several banded bundles of plywood adjacent to the forward bulkhead of the hatch. The rolls of carpet backing were 13 to 14 feet long, 1½ to 2 feet in diameter, and weighed approximately 1,500 pounds each. The rolls were stowed with their lengths perpendicular to the center line of the vessel, and they were stacked in tiers with each roll tightly abutting the ones next to it. The rolls in the subsequent tiers rested in the recesses formed by the junctions of the rolls below. DiRago claimed at trial and Export does not contest on appeal that the rolls had been improperly stowed in Bangladesh without insertion of chocks to fix the bottommost rolls in place. No representative of Export warned I.T.O. about the absence of chocks.

In order to discharge the cargo, I.T.O. elected to use a forklift machine (or "chisel") which had been fitted with a prong. By inserting the prong into their cores, the machine could remove the rolls from the stow one at a time. Complicating the task of taking the carpet backing out of the wings and into the center of the deck for hoisting was the fact that the forklift machine could not reach the forwardmost rolls because it was blocked by the plywood bundles and by the presence of a stanchion in both the starboard and port wings. DiRago contended that this configuration prevented a complete tier-for-tier discharge on each side (which might have maintained the stability of the remaining stow at all times), with the result that as the aft portions of the stow were brought out of the wings, a pile of unstable rolls remained stacked at the forward end on each side. There was conflicting testimony as to the exact method of discharge DiRago's crew employed under such circumstances. According to Collins, the tier-by-tier method was used for the aft portion and the forward portion was loosened by undermining it. According to DiRago and Pakech, the entire load had to be discharged by undermining since the rolls were fitted so that the top tier was between the coaming of the hold and the side of the vessel. This prevented the use of the usual prong to discharge the top roll because only its bottom half was showing. It was allegedly necessary, therefore, to work out a roll from a lower tier so that the top tier would then fall down into the "V" thus formed—a procedure Collins called "dangerous" and denied was used. In any event, testimony was offered by Export to show that neither of the methods testified to by plaintiff's witnesses was the safest possible.

Nonetheless, at this point the crew assumed the cargo to be chocked. Not until Pakech removed the rolls comprising the bottom tier on the port side was it discovered that there were no chocks under any of the rolls. Collins ordered his men to stay

out of the area aft of the remaining pile because of the danger that they might collapse. No such problem eventuated on the port side. However, during the course of the discharge of the starboard rolls, at a time when DiRago was inadvertently in the portion of the starboard wing from which rolls had been cleared, the remaining rolls at the forward end suddenly collapsed, striking him. He had just helped guide a draft loaded with several rolls up and out of the hold. Keeping his eyes on the draft and being careful not to stand under it, DiRago had walked backwards into the starboard area.

■ At trial, DiRago argued on the basis of the facts above that his injuries were caused by the defendant's failure to inspect that the cargo was properly secured by chocks; that the shipowner knew or had reason to know that this created an unreasonable risk of harm to the longshoremen, including plaintiff; and that the shipowner did not take reasonable steps to prevent such harm from occurring. In this way, the plaintiff satisfied the three-part test for § 905(b) recovery set forth in *Griffith v. Wheeling-Pittsburgh Steel Corp.*, 610 F.2d 116 (3d Cir. 1979), *appeal docketed*, No. 79–813, 48 U.S.L.W. 3374 (S.Ct. Dec. 4, 1979) (hereinafter *Griffith*), in which this court recognized that § 905(b) imposes on vessel owners the same duty to exercise "reasonable care under the circumstances" of each case that would be applicable to a land-based business.[1] The vessel owner in *Griffith* had argued that a vessel should not be held liable if it has delivered the ship in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he would expect to encounter, will be able to load or unload the vessel safely by exercising ordinary care under the circumstances. In rejecting this argument, the court relied on the clear implication by

the Supreme Court in *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), that injured longshoremen could recover in full against a negligent shipowner, even where the stevedore was concurrently negligent.

Thus to avoid the impact of *Griffith* and *Edmonds*, Export is forced, in effect, to argue that this is not a case of concurrent negligence. Instead, it contends the failure of the stevedore company to prevent harm from the unchocked stowage constitutes a superseding cause and thereby relieves the shipowner of all responsibility. Export relies principally on § 452 of the Restatement (Second) of Torts, which this court has indicated is an appropriate guide in actions by longshoremen against shipowners. *Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 863 (3d Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977). However, until now, this court has never been called upon to address precisely when and how § 452 applies.

That provision reads in full:

§ 452. Third Person's Failure to Prevent Harm

(1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm.

(2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause.

The text and accompanying comments leave no doubt that subsection (1) states the general rule and that subsection (2), on which Export relies, is decidedly the exception. To that extent, § 452 adheres to the usual notion that connected acts of negligence

---

1. At a minimum, we think that the standard of reasonable care under the circumstances would permit a finding of negligence upon a showing: (1) that the vessel knew of or by the exercise of reasonable care could have discovered the condition on board ship that led to the injury; (2) that the vessel knew or

should have known that the condition would pose an unreasonable risk of harm to longshoremen working on board ship; and (3) that the vessel failed to exercise reasonable care to protect the longshoremen against that danger.
610 F.2d at 126.

result in concurrent liability and that the law recognizes the possibility of more than one proximate cause for a given injury. Thus, § 452 is, in fact, more properly viewed as a basis on which the vessel is held liable despite the negligence of the stevedore, rather than as an escape clause for the defendant shipowner.

Export, however, argues that this case comes within the ambit of subsection (2). Unfortunately, the Restatement gives little assistance in defining the standards for measuring when responsibility has shifted to a third person. *See Blackburn v. Prudential Lines, Inc.,* 454 F.Supp. 1302, 1308 (E.D.Pa.1978). At first glance, the burden on one seeking to invoke § 452(2) would seem to be a heavy one. Comment (e) suggests that the subsection is applicable only to "exceptional" cases and adds, significantly, that "where the personal safety of third persons is threatened it is probably true that normally any duty to exercise reasonable care for their protection cannot be shifted." [2]

Appellant Export advances two reasons for nonetheless treating this as an "exceptional" case in which the duty to prevent harm had fully shifted to the stevedore. First, it argues that Congressional policy, as reflected in the 1972 Amendments to the LHWCA, contemplates that stevedores will be solely responsible for accidents occurring after they have assumed control of the ship and begun unloading. Secondly, it is Export's contention that the negligence of the stevedores in this case rose to the level of gross or "exceptional" recklessness and thus constitutes a superseding cause.

The reliance on Congressional intent is not persuasive. The House Report on the 1972 Amendments makes it clear that in abolishing the vessel owners' non-delegable duty, the drafters did not intend that full responsibility was thereby delegated to stevedores. H.R.Rep.92–1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 4698, 4704 (hereinafter "House Report"). The imposition of a duty on stevedores did not relieve owners of their duty to exercise reasonable care with regard to the condition of the ship:

> Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus, nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition.

> . . . . .

> Under this standard, as adopted by the Committee, there will, of course, be disputes as to whether the vessel was negligent in a particular case. *Such issues can only be resolved through the application of accepted principles of tort law and the ordinary process of litigation—just as they are in cases involving alleged negligence by land-based third parties.*

House Report at 4704 (emphasis added). Such discussion hardly supports the view that Congress meant courts to treat cases involving longshoremen's injuries as "exceptional." What *is* exceptional about the Congressional scheme under the 1972 Amendments is that only the vessel owner and not the stevedore can be a party to the longshoreman's suit. But the Supreme Court in *Edmonds v. Compagnie Generale Transatlantique, supra,* refused to infer

---

**2.** This presumption is reflected elsewhere in the *Restatement.* For example, §§ 392–93 indicate that responsibility does not normally shift when a supplier of goods permits another's employees to load and unload them in fulfillment of his contract to deliver. This court has previously intimated in *Griffith* that the provisions applicable to suppliers of chattel in commerce may be an appropriate analogue for use in longshoremen injury suits. 610 F.2d at 125. That being so, the express provision for concurrent liability in § 393 takes on added significance and casts doubt on Export's theory that full responsibility typically shifts to the stevedore. The section reads:

> *Effect of Third Person's Duty to Inspect*
> One who supplies through a third person a chattel to be used for the supplier's business purposes is subject to liability ... although the dangerous character or condition of the chattel is discoverable by an inspection which the third person is under a duty to the person injured to make.

*See also* Comment a.

from this that a shipowner could only be held liable only where its negligence was the *sole* cause. Indeed it indicated that a vessel owner's principal defense against liability, like that of most tort defendants, is to show the absence of proximate cause. 443 U.S. at 265 n.15.

 Export places much reliance on the applicability of OSHA's Safety and Health Regulations for Longshoring, which impose on the stevedore who breaks down cargo the duty to take precautions, "when necessary to prevent the remaining cargo from falling." 29 C.F.R. § 1918.83(b) (1979). However, the regulation does not by its terms preclude a finding that shipowner negligence also contributed to an accident by creating a latent danger. Indeed, to interpret the OSHA regulations as establishing a full shift of responsibility for purposes of § 452(2) is to ignore the preface to the longshoring regulations which states:

> It is not the intent of the regulations of this part to place additional responsibilities or duties on owners, operators, agents or masters of vessels unless such persons are acting as employers, ... *Nor is it the intent of these regulations to relieve such owners, operators, agents or masters of vessels from responsibilities or duties now placed upon them by law, regulation or custom.*

29 C.F.R. § 1918.2(b) (emphasis added). *See Blackburn v. Prudential Lines, Inc., supra.* Appellant fails to convince us that common law negligence doctrine has been preempted by the OSHA regulations.[3]

Although the effect of § 452 was not considered in *Griffith*, the reasoning of that decision is controlling. Indeed, to accept Export's argument that § 452(2) applies because of Congressional mandate or the peculiar nature of the stevedore-vessel owner relationship would be to reintroduce through the back door the very same "divided duties" approach which *Griffith* rejected.

 There remains the possibility that the interplay of specific facts *in this particular case* might indicate that full responsibility had shifted to the stevedore. After deeming it "impossible to state any comprehensive rule" as to when responsibility shifts, § 452, Comment f, suggests several factors to be considered: the degree of danger, the magnitude of risk, the stevedore's knowledge of the danger, and the likelihood that he will or will not exercise proper care, the stevedore's relation to plaintiff or defendant, and the lapse of time between the defendant's negligence and plaintiff's injury. The issue thus becomes, whether on consideration of these factors in this case, there is a basis for applying § 452(2), in which event the defendant might be entitled to have the jury instructed on superseding cause.

Applying the enumerated factors to this case, Export first stresses the contractual and oral assurances given to it by I.T.O., DiRago's employer, that stevedoring operations would be performed safely and competently, entitling it to assume that I.T.O. would take the precautions necessary to avert injuries. However, such general warranties are universally given and, if given weight, would absolve vessel owners in almost every case. Such a result would thwart Congress' clear intent to eliminate the significance of indemnity agreements between stevedoring companies and vessel owners, by which the latter shielded themselves from the harsh consequences of liability without fault under the unseaworthiness doctrine.[4] *See* House Report at 4704–05.

Alternatively, Export emphasizes the lapse of time. It points out that the steve-

---

**3.** Therefore, the court below was correct to inform the jury of the OSHA regulations as evidence of a stevedore's duties and the care with which a shipowner could legitimately expect a stevedore to proceed; but, it properly cautioned the jury that particular circumstances might indicate to a reasonably prudent shipowner that such an assumption was unwarranted, in which case the regulations did not subtract from the vessel owner's common law responsibility.

**4.** Section 905(b) provides in relevant part that in the case of injury to a covered employee, "the employer [stevedore] shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void."

dore became aware of the absence of chocks when it uncovered the bottom tier on the port side and that from that time to the moment of the accident, I.T.O. had ample opportunity, including a one hour lunch break, to obtain any additional equipment or materials it needed to perform the work properly. As Chief Judge Lord noted in a § 905(b) case with somewhat similar facts, "[t]here can be no bright lines as to when the lapse of time is itself sufficient to make a shift of full responsibility." *Blackburn v. Prudential Lines, Inc., supra*, 452 F.Supp. at 1309. *See* Restatement (Second) of Torts § 452, Illustration 9, (1965) (six months sufficient for full shift); W. Prosser, *The Law of Torts*, § 44, at 289 (1971) (describing the lapse of time cases as difficult to explain and suggesting they are best understood, "merely on the ground that there must be a terminus somewhere, short of eternity, at which the second party becomes responsible in lieu of the first"). We do not believe that a matter of hours in this context makes this one of the "exceptional" cases in which a jury could find that the entire responsibility had shifted.[5]

Export's claim that the stevedore's selection of equipment or use of a V-wedge

undermining process was extraordinarily negligent and thus provided a basis for instructions on superseding cause presents a closer question. Among the factors which the commentary to § 452(2) suggests may shift responsibility to a third person are that person's "knowledge of the danger and the likelihood that he will or will not exercise proper care." However, the existence of these factors alone, rather than in combination with deliberate disregard of an express warning[6] or lapse of time,[7] would not seem sufficient to warrant instructing the jury that full responsibility potentially shifted. It is enough that the jury be instructed to consider whether the stevedore's knowledge and intervening negligence was foreseeable and whether the vessel owner's antecedent negligence thus remained a substantial factor in bringing about the injury. We find support for our view in § 447 of the Restatement[8] and conclude that the close adherence of the instructions given in this case to that provision[9] leave defendant Export with little grounds for complaint.

This conclusion is most consistent with this court's holding in *Griffith*. We agree with Export that vessel owners should not always have to bear the costs of injuries to

---

**5.** We note in passing that among the factors to be considered in applying § 452(2) are the degree of danger and magnitude of the risk. In the kind of rough calculus § 452 seems to envision, the probability of severe injury from unchocked rolls of carpet backing, weighing 1500 lbs. each, should not be overlooked.

**6.** Restatement (Second) of Torts, § 452, Illustration 9 (1965).

**7.** Id., Illustration 10.

**8.** § 447. Negligence of Intervening Acts
The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if
(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or
(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or

(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

**9.** The trial judge explained:
Now although the defendant shipowner may be only held liable for its own negligence, and not for the negligence, if any, of the stevedores, *if as a reasonably prudent person or shipowner the defendant should anticipate the negligence of another*, such as a stevedore, that would cause harm to some third person, the shipowner might nevertheless be found to be negligent, and a negligent act of omission may be one which involves unreasonable risk of harm to a longshoreman through either the operation of negligence or a negligent act of the shipowner, or by the foreseeable action of another, such as the stevedore.
An act or an omission may be negligent if the shipowner realizes, or should realize that it involves unreasonable risk of harm to the longshoremen, through the negligence or reckless conduct of some third party such as the stevedore. Thus, the shipowner is under a duty to exercise reasonable care under all of the circumstances.

longshoremen occasioned by the stevedore's extraordinary negligence. However, we find that the instructions patterned after *Griffith* adequately shield the vessel owner from such liability without resorting to the ambiguities inherent in §. 452. The charge promulgated in *Griffith* made foreseeability a core element of the vessel's standard of care. Owners were charged with a duty to inspect for those conditions which they "knew or should have known ... would pose an unreasonable risk of harm to longshoremen working on board ship." 610 F.2d at 126. In determining whether a risk was unreasonable "the *likelihood* of negligent conduct on the part of the stevedoring contractor" was sometimes relevant, a point the court emphasized by reference to Restatement (Second) of Torts § 302A (1976), which reads:

> An act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person.

Thus, if the jury finds the stevedore's conduct in a given case to be negligent, *Griffith* suggests the jury must then determine whether such a negligent response was nonetheless foreseeable to the vessel owner. If so, the shipowner would not be relieved of liability for creating the hazard in the first place. Conversely, if the stevedore's negligence is truly extraordinary, the *Griffith* charge permits the jury to absolve the vessel. *See also McCarthy v. Silver Bulk Shipping Ltd.*, 487 F.Supp. 1021, 1029 n.20 (E.D.Pa.1980).

Thus, in effect, the issue of the extraordinariness of the stevedore's negligence was put to the jury and resolved in this case.

Where a jury is directed to impose liability upon the defendant only if the stevedore's intervening negligence could have been anticipated,[10] the jury's verdict for the plaintiff would seem to dispense with the notion that the failure of the stevedore to remove or avoid the danger was extraordinary enough to constitute superseding cause.

■■■■ A party is entitled to have its requested instructions given only when there is evidence in the record supporting their submission. *Smith v. Lauritzen*, 356 F.2d 171 (3d Cir. 1966) (longshoreman's suit); *McNello v. Kelly, Inc.*, 283 F.2d 96 (3d Cir. 1960). Perhaps instructions on superseding cause would be justified where, for example, evidence showed that the stevedore had rejected offers of assistance by the vessel owners, had been alerted to the danger some time in advance, or had expressly assured the owner that in spite of the unchocked condition of the stowage, it had the matter under control and would assume full responsibility for unloading the cargo safely. *Cf. Blackburn v. Prudential Lines, Inc.*, supra, 454 F.Supp. at 1309 n.8; Restatement (Second) of Torts § 452, Comment e, Illustrations 5 & 10 (1965). We thus decline to hold that § 452(2) is never available to shipowners in injury suits by longshoremen. Where, however, evidence of such communications between vessel and stevedore is lacking and the vessel contends that the stevedore recklessly disregarded a discovered hazard in the stowage, the vessel's defense should be subjected to the usual test of foreseeability under the circumstances.

By its verdict for the plaintiff, the jury in this case implicitly found the vessel owner should have known that the unchocked stow created a hazardous working condition for

---

10. *See* note 9, *supra*.

The force of Export's complaint is further weakened when one considers that the lower court included in its instructions a presumption favorable to the defendant vessel:

> The shipowner, therefore, in the absence of circumstances indicating to a prudent, reasonably prudent person to the contrary, has the right to assume that the stevedore will conduct its operations in a non-negligent manner.

> The defendant, being the shipowner, is entitled to take into account the experience and

expertise of the stevedore in assessing the relative safety of the conditions that the stevedore, and its employees, will confront during the performance of their work. Charge of the Court at 28.

We do not address the necessity or validity of such a presumption, except to say that a verdict delivered in favor of the plaintiff *despite* such instructions should not lightly be disturbed.

longshoremen and implicitly rejected the Export claim that it could not foresee the stevedore's subsequent acts. The shipowner knew longshoremen would be working in the hold, might not simply quit unloading once the danger was discovered, and thus might have to improvise a risky method of discharge. Granted, Export demonstrated that alternative methods of discharge were available and that the stevedore crew exercised poor judgment. However, in light of testimony by Collins, the gang foreman, and Capt. Cullen, an expert witness, that such unchocked stowage was rarely encountered,[11] the jury might not find it surprising that the stevedore crew's attempts to prevent the threatened harm from occurring were feeble and unsuccessful. Hence, we find there was sufficient evidence for plaintiff to have prevailed under the standard enunciated in *Griffith* and reaffirmed today.

Those who perceive in the 1972 LHWCA Amendments a leniency towards stevedore-employers may be tempted to seize upon § 452(2) as a means of rectifying the imbalance and inducing stevedores to exercise greater precaution on the job. The 1972 Amendments entitled injured longshoremen to statutory benefits under a workmen's compensation scheme; in return for their participation, the employers were insulated from injury suits by their employees. However, stevedore companies continue to enjoy lien rights in any recovery the longshoreman obtains by suing the vessel himself, with the result that the longshoreman's employer is out of pocket only the excess of the statutory benefits over the amount recovered against the vessel. 33 U.S.C. § 933(f) (1976). Critics of the current scheme object that such lien rights undermine the stevedore-employer's incentive to exercise care and instead shifts the weight of deterrence onto the vessel owner who is rarely in a position to control the conduct of stevedoring operations.

Such criticism, however valid, is. more appropriately directed to Congress, especially where "some inequity appears inevitable," as the Supreme Court observed when it was asked to superimpose the "equitable credit doctrine" on the LHWCA scheme in *Edmonds v. Compagnie Generale Transatlantique, supra,* 443 U.S. at 270, 99 S.Ct. at 2761. In that decision, the Court noted the potential inequities created by the stevedore's lien rights, but squarely rejected an opportunity to redress them. It indicated unwillingness to disturb the balance struck by legislation which had all the earmarks of a carefully bargained political compromise.[12] This court should show similar deference and not miscast what would otherwise be considered a case of concurrent negligence as an "exceptional" case of shifted responsibility simply because Congress has chosen to insulate one of the joint tort-feasors from suit.[13]

Moreover, to shift full responsibility to the stevedore once it discovers and attempts to eliminate the hazard created by the vessel, as Export would have us do, merely substitutes new inequities for old ones. If Export's theory were accepted, vessel owners would have correspondingly less incentive to assure proper stowage of cargo, over which they clearly have more control than do the stevedores. The fact that only the stevedore is in a position to effect a remedy

---

11. Indeed, Collins testified that in all his experience he had never seen a cargo such as the carpet backing come in unchocked.

12. The Court observed:

In 1972 Congress aligned the rights and liabilities of stevedores, shipowners, and longshoremen in light of the rules of maritime law that it chose not to change. "One of the most controversial and difficult issues which [Congress was] required to resolve ... concern[ed] the liability of vessels, as third parties, to pay damages to longshoremen who are injured while engaged in stevedoring operations." S.Rep. 8. By now changing what we have already established that Congress understood to be the law, and did not itself wish to modify, we might knock out of kilter the delicate balance. As our cases advise, we should stay our hand in these circumstances [citations omitted]. 443 U.S. at 272–73.

13. The Supreme Court may soon have more to say about the respective duties of stevedores and vessel owners in a § 905(b) action, when it decides the appeal in *Santos v. Scindia Steam Navigation Co.,* 598 F.2d 480 (9th Cir. 1979), *cert. granted,* 446 U.S. 934, 100 S.Ct. 2150, 64 L.Ed.2d 786 (1980).

at the time and scene of the accident does not mean the vessel owner should not be deterred from allowing the hazardous working condition to exist in the first place. Imposition of liability upon the vessel in the case at bar will thus promote safer working conditions for longshoremen, consistent with Congress' purpose to alleviate dangers in one of today's most hazardous occupations.

Accordingly, the judgment of the lower court will be affirmed.

ROSENN, Circuit Judge, dissenting:

The majority opinion approves the district court's refusal to instruct the jury on superseding cause despite evidence that the stevedore company had knowledge of the dangerous condition and declined to adopt the safest procedures. The stevedore deliberately elected instead to disregard the defective stacking of the carpet backing rolls and, in its own interest, to "use" the condition to speed unloading. Because I believe that in such a case a general instruction on proximate cause is wholly insufficient and an instruction on superseding cause is required, I respectfully dissent.

## I.

I.T.O. Corp. (I.T.O.), a stevedore company, had undertaken as an independent contractor the job of unloading from the EXPORT AGENT, a ship owned by defendant American Export Lines (Export), rolls of carpet backing. At the time of the accident, DiRago, Stephen Pakech and gang foreman William Collins were part of an I.T.O. crew working on the 'tween deck of No. 3 hold. Approximately 104 rolls were stowed on the deck, half on each side of the vessel, arranged athwartship so that the lengths of the rolls were perpendicular to the centerline of the vessel. The rolls had been stacked in Bangladesh in four or five tiers, with rolls of each tier above the first resting in recesses in the tier below, as a load of pipe would be stowed. The accident occurred on the starboard side after many of the rolls had already been removed, creating a "V" cut in the stowage that went to the floor. DiRago was standing in that cut when the remaining rolls of stacked carpet backing shifted and rolled into the cut, striking and injuring DiRago.

Although there was conflicting evidence about which procedures were used in the unloading and about the propriety of some of those procedures, certain facts are undisputed, and some of the disputes are not material to the issue on appeal. Export allegedly was negligent in failing to provide a safe working place for the longshoremen (1) by not requiring that the load of rolls be chocked when stowed in Bangladesh, and (2) by failing to warn the longshoremen of this unsafe condition. Export admits that no chocks, small wooden blocks, had been placed in the rolls. DiRago's theory in the district court was that customarily chocks are placed against each roll in the bottom tier, and that had chocks been placed there, the load would not have shifted causing him injury. Although at trial, Export offered conflicting testimony about this "custom," on appeal Export does not challenge the finding of the jury that the rolls were improperly stowed and that Export was negligent for allowing such stowage. Rather, Export's contention is that the negligence of a third party, the stevedore company, I.T.O., is of such a nature as to relieve Export of liability for its negligence. Expressed in other words, Export argues that the alleged negligence of I.T.O. is a superseding cause of DiRago's injuries, as provided in Restatement (Second) of Torts §§ 440–442, 452 (1965). To evaluate this argument it is necessary to understand the facts leading to DiRago's injury.

DiRago, Pakech and Collins began their work on the 'tween deck of No. 3 hold at approximately 10:30 a. m. on April 14, 1977. To remove the rolls of carpet backing they used a "chisel," a forklift equipped with a prong that could be inserted into each roll. By using the chisel, each roll could be lifted from the stack and transported to an area below the hatch. There the rolls were placed on a sling which, when a number of rolls were gathered together, was lifted with a hoist through the hatch and out of the hold.

When the stevedore crew began work, they did not know that the rolls were un-

chocked. At no time did Export warn them of this condition or advise them to follow special procedures. Despite the lack of chocking, had the rolls been removed tier-by-tier, the accident would never have occurred. When unloading began, tier-by-tier removal was not possible. First, the approach with the forklift to the forward part of the stowage on each side was blocked by two stacks of plywood. Collins, the gang foreman, asked an officer of the vessel if the plywood could be placed temporarily on the dock to facilitate the unloading, but the officer refused, fearing the theft of the plywood if it were removed. Collins could have "appealed" this denial, but he declined to do so. Second, access was further limited by two-foot diameter stanchions, one at each of the two forward corners of the hatch. Third, there was disputed evidence that removal of the top tier was limited by the coaming extending into the hold from around the hatch above. The coaming however, did not limit removal of lower tiers and did not make necessary a cut to the floor. Further, apparently the stanchions alone would not have prevented tier-by-tier removal, although they might have made it more difficult. Thus tier-by-tier removal would have been feasible except for the plywood, the removal of which might have been accomplished had Collins pursued the issue.

The carpet backing on the port side was removed first without incident. The crew used the "V" cut method. By so doing, when they first reached the floor, long before they finished the port side, they discovered that the rolls were not chocked. Despite this discovery, they continued to unload by using the cut in the stack. In fact, DiRago testified tier-by-tier removal was

rejected because it would have taken "too much time." The forklift operator actually took advantage of the lack of chocks, undermining the stack and allowing several rolls at a time to fall to the floor where they were more easily picked up. There was evidence that this method violated Occupational Safety and Health Administration (OSHA) regulations.[1] *See* 29 C.F.R. §§ 1918.83(a) & (b) (1980). Even though the rolls were not chocked and the crew purposely let them collapse to the floor, all the rolls stowed on the port side had been removed without mishap shortly before the noon lunch hour.

Work began on the starboard or opposite side before noon. At that time, with the port side clear, the several bundles of plywood could have been easily moved out of the way without taking them from the hold, thus removing the only real obstacle to tier-by-tier unloading. This was not done.[2] Instead, the stevedore crew continued to unload by using a cut to the floor. The lunch hour came and work stopped. Shortly after work resumed following lunch, when approximately 15 feet of floor had been cleared in the middle of the stack, the accident occurred. DiRago testified that he had just finished guiding, by hand, a sling of rolls being hoisted from the hold. He stepped into the clearing in the stack to get clear of the load going up. At this time, according to DiRago, the stack of rolls remaining in the forward part of the hold collapsed. The falling rolls struck and injured him. Despite this accident, when work resumed after the injured DiRago was removed, the I.T.O. crew continued to unload by the same method of rolling the carpet backing into the cut.

1. Collins, the gang foreman, disputed DiRago's testimony that the cut method was used in this way and to save time. Collins maintained that such a method would be unsafe. That was proved by this injury. Because such a method may violate OSHA regulations, it is not surprising that the stevedore supervisor would not want to admit the use of such a procedure. As is proper, I will assume the truth of the testimony of appellee DiRago, testimony corroborated by co-worker Pakech, and thus reject Collins' version.

2. Collins stated that a different type of forklift would have been needed to move the plywood. But that machine could have been brought on without approval of any officers of the vessel. Further, the need for other equipment was no less true when the request to move the plywood was made in the morning. Thus the requirement of additional equipment was not a significant obstacle to this safety precaution.

At the trial, the defendant requested that the jury be instructed on superseding cause because, Export argued, I.T.O.'s negligence in its choice of a method to unload cargo was negligence of such a nature that the jury could find it to be the superseding cause of the injury, thus relieving Export from liability. The district court declined, stating:

I will not charge as to superseding cause. It seems to me that if there is negligence, which is a proximate cause, that is all that is necessary, and that if, in fact, there is a superseding cause, it's a superseding cause, because the negligence itself is not a proximate cause.

In other words, if there is negligence which is a proximate cause, and is a substantial factor, then I don't see how there could be, at least in this case, a superseding cause.

Subsequently, the jury found (1) that Export was negligent and that the negligence of Export was a proximate cause of DiRago's injury, and (2) that DiRago was negligent, that DiRago's negligence was a proximate cause of his injury, and that his negligence contributed five percent to his injury.

## II.

The district court's reasons for refusing the instruction are not persuasive. That court apparently could not discern the distinction between proximate cause and superseding cause. In refusing the instruction, the court stated that "if, in fact, there is a superseding cause, it's a superseding cause, because the negligence itself is not a proximate cause." The district court correctly defined proximate cause as "a substantial factor and a direct cause of the injury." Export's negligence in allowing the stowing of the carpet backing in Bangladesh without chocks admittedly was a proximate cause of the injury. But that does not preclude a finding of superseding cause. As Professor Prosser stated, "the problem is not one of causation at all, since it does not arise until causation is established. It is rather one of the policy as to imposing legal responsibility." W. Prosser,

Law of Torts § 44, at 270 (4th ed. 1971). This distinction is obvious from the language of the Restatement definition of superseding cause: "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another *which his antecedent negligence is a substantial factor in bringing about.*" Restatement (Second) of Torts § 440 (1965) (emphasis added). The Restatement's Comment on that section explains that "[a] superseding cause relieves the actor from liability, *irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm.*" *Id.*, Comment b (emphasis added). The Comment further notes that if in looking back and tracing the sequence of events by which the harm was produced it is found that a superseding cause has operated, there is no need to determine "whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm." *Id.* Plainly the existence of proximate cause does not preclude a jury's finding that the stevedore's negligence was a superseding cause. True, factors that indicate that something is a superseding cause may also indicate that proximate cause is absent. But I do not believe, as the district court apparently did, that in all situations the law of negligence has been reduced to the two words "proximate cause." Therefore, I conclude that the district court's analysis was erroneous.

The question must then be faced as to whether in this case, regardless of whether Export's negligence was a proximate cause of DiRago's injury, a jury could reasonably have found that I.T.O.'s negligence was a superseding cause of the accident. If a jury could so find, an instruction on superseding cause was required and the district court's failure to give that charge was error. The majority, in holding that no such charge was required, necessarily found as a matter of law that the facts of the case could not support a jury finding that I.T.O.'s negligence was a superseding cause. I turn now to the majority's analysis.

### III.

I agree with the majority that the plaintiff satisfied the three-part threshold test for recovery of damages under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b) (1976), as established by this court in *Griffith v. Wheeling-Pittsburgh Steel Corp.*, 610 F.2d 116 (3d Cir. 1979), *appeal docketed*, 48 U.S.L.W. 3374 (U.S. Dec. 4, 1979) (No. 79–813). In *Griffith* this court stated that section 905(b) "imposes on vessel owners the same duty to exercise 'reasonable care under the circumstances of each case' that would be applicable to a land based business." *Id.* at 125, *quoting Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632, 79 S.Ct. 406, 410, 3 L.Ed.2d 550 (1959).[3] In *Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 863 (3d Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977), this court cited Restatement (Second) of Torts § 452 (1965), which defines when the negligence of third parties may be a superseding cause, as an example of one of the "principles of the law of negligence" applicable in LHWCA actions under 33 U.S.C. § 905(b). My sole, but important disagreement with the majority is that I believe section 452(2) of the Restatement should have been applied to the facts of this case.

The Restatement (Second) of Torts (1965) provides:

§ 452. Third Person's Failure to Prevent Harm

(1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm.

(2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause.

Export's position is that on its facts this case falls within subsection (2). The majority is correct that subsection (2) is the exception to the general rule. I also agree with the majority that LHWCA cases are not, as a class, to be treated as exceptional. But neither of these conclusions decides the only real question in this case: whether these particular facts are sufficient to require the instruction of the jury on superseding cause.

Although it may be "impossible to state any comprehensive rule" as to when responsibility for the prevention of harm has shifted to a third person, Restatement (Second) of Torts § 452, Comment f (1965), there are certain factors to be considered in making that decision:

Among them are the degree of danger and the magnitude of the risk of harm, the character and position of the third person who is to take the responsibility, his knowledge of the danger and the likelihood that he will or will not exercise proper care, his relation to the plaintiff or to the defendant, the lapse of time, and perhaps other considerations.

Restatement (Second) of Torts § 343A (1965): "a vessel is not liable for injuries resulting from known or obvious dangers unless the ship owner should anticipate harm despite the obviousness of the danger." Slip op. at 899. This court rejected that standard in *Griffith*. 610 F.2d at 125. This split between circuits may be resolved in *Scindia*. If the Second Circuit standard is adopted by the Supreme Court, then under *Evans* I believe that Export should not, as a matter of law, have been expected to anticipate the harm to DiRago from the negligent condition of the stowage, a danger known to both DiRago and the stevedore company, I.T.O. My analysis in this case, however, does not depend on such a change of law.

---

**3.** This standard is currently under reexamination by the Supreme Court. *Scindia Steam Navigation Co. v. De Los Santos*, 446 U.S. 934, 100 S.Ct. 2150, 64 L.Ed.2d 786 (1980). In *Scindia*, the Ninth Circuit endorsed the "reasonable care under the circumstances" standard. 598 F.2d 480, 485–89 (9th Cir. 1979). In adopting that standard in *Griffith*, this court specifically approved *Scindia*. 610 F.2d at 125. This dissent is written with the assumption that the standard established in *Scindia* and *Griffith* is the correct one.

The Second Circuit, in a recent decision, *Evans v. Transportation Maritime Mexicana SS "Campeche"*, No. 80–7081 (2d Cir. Jan. 5, 1981), followed a different standard, based on

*Id.* The majority is correct that the general warranties given by I.T.O. to Export are insufficient to support a jury finding of superseding cause.[4] However, I believe that the lapse of time between the discovery by the stevedore of the dangerous condition and the accident, the continuing failure of I.T.O. to use a safe method in the face of a known danger, and the inability of Export to correct the dangerous condition constitute facts that together warrant an instruction on superseding cause.[5] In my view, the facts of this case, when evaluated according to the factors enumerated in the Restatement comment, indicate firmly the need for such an instruction.

The first factor, "the degree of danger and the magnitude of the risk of harm," *id.*, according to the majority, weighs against permitting a jury finding of superseding cause. *See* typescript at 12 n.5. I believe their "rough calculus," *id.*, is in error. Although the degree of danger from these unchocked rolls might be abnormal were they stacked in a public area—along a sidewalk or in a department store for example, here they were in a hold of a ship. The only persons present were the ship's crew or employees of the independent stevedore contractor. All these persons were familiar with the handling of cargo. These stevedore employees are trained, seasoned cargo handlers, with all possibly necessary loading equipment available to them. These days cargo is often shifted in large containers, much heavier than carpet backing. At any rate, cargo in 1,500 pound units, as this was, is not abnormal in shipping. Further, DiRago introduced evidence for the expressed purpose of showing that longshoremen were capable of dealing with different types of cargo in the condition it was found. *See Evans v. Transportation Maritime Mexicanna SS "Campeche"*, 639 F.2d 848 at 859 (2d Cir. 1981) ("The stevedore is hired precisely for his expertise in a specialized and often dangerous trade."). Thus, I conclude that although injuries from the heavy objects that longshoremen move are likely to be severe, the degree of danger posed by the carpet backing rolls for such workers is not abnormal and the magnitude of risk slight in light of their admitted skill. Therefore, this factor may actually support a superseding cause instruction.

The second factor, "the character and position of the third person who is to take the responsibility," Restatement (Second) of Torts § 452, Comment f (1965), strongly supports the issuance of an instruction on superseding cause. The third person is I.T.O., hired by Export for the purpose of safely and efficiently unloading the cargo. I.T.O. is a professional stevedore company and as such is as familiar, and probably more familiar, with unloading procedures and risks than the vessel owner. *See Evans v. Transportation Maritime Mexicana SS "Campeche", supra*, at 852 ("Since the stevedore is an independent contractor in control of the cargo operation and is hired specifically for his expertise, the stevedore is ordinarily in the best position to prevent accidents which might arise in the course of loading or unloading a ship."). Further, as an employer, it should have a great interest in protecting its workers. Finally, once the cargo had been stowed in Bangladesh, I.T.O. *alone* was in a position to remedy the dangerous situation when the vessel arrived in Philadelphia. At that point, there was no way for Export to insert chocks. I.T.O., however, had full control of the situation and it could have used a safe method, either by tier-by-tier removal or by insertion of dunnage as chocks during the cut removal process. Unfortunately for DiRago, those safe methods were not as fast as the method of rolling them down, taking advantage of the lack of chocks. The nature and

---

**4.** The LHWCA voids any warranties by employees to vessel owners establishing employer liability for the negligence of vessel owners. 33 U.S.C. § 905(b) (1976).

**5.** The majority considers the lapse of time, *see* typescript at 10, separately from the use of the unsafe procedure, *see id.* at 11. I believe a court normally would and should consider all facts together in deciding whether an instruction on superseding cause is needed. Specifically, although lapse of a few hours might, by itself, be insufficient, that lapse should not be ignored when it combines with a reckless failure to use safe procedures especially in the face of a *known* danger.

character of I.T.O.'s stevedoring operations and its knowledge of the known danger placed it in such a superior position that the issuance of an instruction on superseding cause was required.

The third factor, the third person's "knowledge of the danger and the likelihood that he will or will not exercise proper care," Restatement (Second) of Torts § 452, Comment f (1965), again favors the issuance of an instruction on superseding cause. Several hours before the accident, I.T.O. learned the stowage was unchocked, yet the I.T.O. crew did not alter their method of unloading. The lack of chocks was discovered early in the uneventful unloading of the port side and it was apparent again as unloading progressed on the starboard side, yet the stevedore took no precautions. I.T.O. had knowledge of the danger. I also believe it is proper to conclude that there was a likelihood that I.T.O. would exercise proper care. First, I.T.O. had the expertise and all of the necessary equipment of a stevedore and was hired with the expectation that proper care would be exercised. Second, I.T.O.'s own employees bore the risk from the danger and it owed them a special degree of care. The stevedore has

primary responsibility for the safety of the longshoremen in its employ. *Evans v. Transportation Maritime Mexicana SS "Campeche", supra,* at 852, 859–860. Finally, injury to the employees would be economically costly to I.T.O. The unloading would be delayed costing the stevedore money and the stevedore might incur losses for workmen's compensation, if the injured longshoreman were unable subsequently to recoup his losses and those of the stevedore under the LHWCA.[6] Thus, I believe there is an expectation that I.T.O. would exercise proper care, and again the factor supports a jury finding of superseding cause.

The fourth factor, the third person's "relation to the plaintiff or the defendant," Restatement (Second) of Torts § 452, Comment f (1965), has been noted already, and again strongly supports a superseding cause instruction. Export hired I.T.O. with the expectation that it would conduct its business expertly and safely. As the employer of the plaintiff DiRago, it had a duty to provide him with safe "places of employment", 33 U.S.C. § 941(a) (1976), and with safe working procedures. *See* 29 C.F.R. §§ 1918.83(a) & (b) (1980).[7] This factor also

---

**6.** As the majority notes, *see* typescript at 16, stevedore companies have judicially created lien rights in any recovery a longshoreman obtains in his suit against the vessel for the amount paid to the longshoreman by the stevedore as workmen's compensation. *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 269–70, 99 S.Ct. 2753, 2760–61, 61 L.Ed.2d 521 (1979). *See* 33 U.S.C. § 933(f) (1976) (statutory compensation reduced by recovery).

Because of this lien, a stevedore may be able to avoid all or much of any financial loss, regardless of its negligence. I concur with Judge Friendly's observation that

we are compelled by the combination of statute and Supreme Court decisions to sanction a result wherein if a properly charged jury were to find in [an injured longshoreman's] favor in [an amount not significantly greater than the amount owed to the longshoreman by the stevedore as workmen's compensation], the less negligent ship would bear the entire load, the more negligent employer would emerge scot-free, and [the longshoreman] would take nothing, so that the beneficiaries of the recovery would be [the longshoreman's] lawyer and his employer's compensation insurer. Our judicial system

should not be obliged to countenance so palpably unjust a result, and the maritime industry should not be exposed to such costs. *Evans v. Transportation Maritime Mexicana SS "Campeche", supra,* slip op. at 916–17.

To me, the decision of the majority compounds the injustice of this situation. In holding that this evidence is insufficient to support a finding of superseding cause, I believe they are requiring the shipping industry to make conditions on its vessels foolproof. For an industry already beset with enormous problems, the cost of such foolproofing may be unbearable.

**7.** I agree with the majority that the OSHA regulations do not relieve vessel owners of any pre-existing responsibilities or duties, 29 C.F.R. § 1918.2(b) (1980), but that does not mean they should be ignored. Rather, I believe these particular regulations merely codify preexisting duties of the stevedore and that violation of those duties, even before the OSHA, is relevant to whether the negligence of the stevedore was a superseding cause of a longshoreman's injury. As the majority notes, *see* typescript at 10 n.3, the regulations are proper evidence of the stevedore's duties to its employees. To recognize this duty as a further factor supporting the

indicates that an instruction on superseding cause was required.

The final factor, "lapse of time," Restatement (Second) of Torts § 452, Comment f (1965), is the weakest in terms of supporting a conclusion that a superseding cause instruction was required. While there was a significant lapse of time between Export's negligence in Bangladesh and the accident in Philadelphia, there were only a few hours between the discovery by the stevedore of the dangerous condition and the accident. However, for three reasons, I believe sufficient time elapsed to warrant a superseding cause instruction. First, the stevedore had enough time to change its method; that would have taken no time. Second, a stevedore never has much time between the arrival of a ship and the beginning of its operation. Shipping companies want to unload quickly and leave. At most a stevedore would have a few days notice, and I can find no meaningful distinction between a few hours and a few days in this setting. If the majority is correct that a great lapse of time between discovery by a stevedore and an accident is a prerequisite to superseding cause, then I can imagine no longshoreman's case where it would be appropriate. Third, I.T.O. cannot complain about lack of time; even after the accident it continued to use the same method of unloading. It is unlikely that six months of accident-free unloading would have led I.T.O. to change its method. Whether or not sufficient lapse of time occurred to require by itself a superseding cause instruction, its combination with the other factors all indicate that such an instruction was necessary.[8] Because I believe the failure to give such an instruction was reversible error, I would vacate the judgment and re-

mand the case to the district court for a new trial.

## IV.

The majority disparages Export's argument that a superseding cause instruction was needed as an attempt "to avoid the impact" of *Griffith, supra,* and *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979). But neither of those cases addressed the situation found here, nor will their holdings be eroded by the giving of instructions on superseding cause in cases such as this.

*Griffith* involved a barge with damaged hatch covers. The dangerous condition caused by the owner's negligent failure to maintain the barge could have been corrected at anytime. Failure to correct that condition was ongoing, concurrent negligence. In this case, once the carpet backing had been stowed, there was no way to correct the condition. Rather the only remedy was careful unloading. Given that the stevedore and its employees knew of that condition, and that only they could take the steps to prevent harm from arising from that condition, an instruction on superseding cause was required.

The Supreme Court in *Edmonds, supra,* was not faced with a superseding cause situation. Edmonds was injured when, on the instruction of a member of the ship's crew, he went behind a large cargo container to remove a jack. A co-worker of Edmonds then drove a truck into the container, causing it to roll backwards and pin Edmonds against the bulkhead. 443 U.S. at 274, 99 S.Ct. at 2764 (Blackmun, J., dissenting). The negligence of the shipowner, occurring immediately before the accident,

---

grant of an instruction on superseding cause in no way "preempt[s]" common law negligence, as the majority would have us believe. *See* typescript at 9.

**8.** The majority suggests that this case might be different if an express warning had been given. To me, that distinction is specious in a case such as this when the third person, a contractor and employer, owed duties to both defendant and plaintiff and had knowledge of the

dangerous condition, yet chose to disregard it because of the economic incentive in using the fast, unsafe method made possible only by taking advantage of the very defect. The message to vessel owners by such a decision is plain: Expressly "warn" every stevedore of all known aspects of all cargo to be loaded or stowage to be unloaded. This seems to me to resurrect a perverse warranty system that section 905 meant to abolish.

was the crew member's ordering of Edmonds into the dangerous position. The co-worker's negligence had none of the attributes of a superseding cause, attributes that I believe are plain in this case. Thus, *Edmonds* does not suggest that the doctrine of superseding cause has no place in LHWCA cases. This is not surprising because in *Edmonds* the sole issue was apportionment of damages, not a question of when legal responsibility will or will not be imposed. *See* W. Prosser, Law of Torts § 44, at 270 (4th ed. 1971). Because the Court in *Edmonds* never considered the issue of superseding cause, nor was that issue presented on the facts, *Edmonds* cannot stand for the proposition that superseding cause instructions are precluded in LHWCA cases.

The majority cites *Edmonds*, 443 U.S. at 265 n.15, 99 S.Ct. at 2759 n.15, for the proposition that a vessel owner's "principal defense," typescript at 9, in a damage suit is absence of proximate cause. Note 15 states: "In many cases, of course, the shipowner whose act or omission contributed only a very small percentage of the total negligence will avoid liability on the ground of lack of causation." There is nothing there to indicate that lack of causation is the "principal defense." In saying that the question of proximate cause subsumes the issue of superseding cause, the majority makes the same error as that made by the district court. The two doctrines, at least in my understanding of the law of torts, have not yet been merged. If a vessel owner's negligence is not a proximate cause, then a third party's negligence is not a superseding cause for there is nothing to supersede. Rather, only when it is shown that a defendant's negligence is a proximate cause, does the question of superseding cause arise.

### V.

Because I believe that the district court relied on incorrect reasoning in denying the requested instruction, that no cases or statutes suggest that the superseding cause doctrine is inappropriate in LHWCA cases,

and that the facts of this case could sufficiently support a jury finding that I.T.O.'s negligence was a superseding cause of DiRago's injury, thus absolving Export of any liability for its negligence, I conclude that an instruction on superseding cause is required. Accordingly, I would reverse the judgment and remand the case for a new trial.