UNITED STATES LINES, INC. as Owner of the SS American Courier, Appellee,

v.

NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Appellant,

and

Bethlehem Steel Corporation and Turbine Enterprises, Inc., Appellees.

UNITED STATES LINES, INC. as Owner of the SS American Courier, Appellee,

v.

NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Bethlehem Steel Corporation, Appellees,

and

Turbine Enterprises, Inc., Appellant.

Nos. 82–1039(L), 82–1065.

United States Court of Appeals, Fourth Circuit.

Argued May 4, 1982.

Decided Sept. 1, 1982.

Rehearing Denied Oct. 18, 1982.

John T. Kochendorfer (Bigham, Englar, Jones & Houston, New York City) and R. Arthur Jett (Jett, Agelasto, Berkley, Furr & Price, Norfolk, Va., on brief) for appellant Newport News, and Richard Gulick, Norfolk, Va., for appellant Turbine Enterprises.

G. W. Birkhead (Vandeventer, Black, Meredith & Martin, Norfolk, Va.) and Alexander E. Rugani and Harry A. Gotimer (Kirlin, Campbell & Keating, New York City, on brief) for appellee United States Lines and Geoffrey F. Birkhead (Crenshaw, Ware & Johnson, Norfolk, Va.) for appellee Bethlehem Steel.

Before HALL and SPROUSE, Circuit Judges, and DOUMAR,* District Judge.

SPROUSE, Circuit Judge:

This is an admiralty case brought by a shipping line against three defendants to recover for damage to one of its ships caused by the faulty repair of a turbine. The ship is owned and operated by the plaintiff, United States Lines, Inc. (USL),

---

* Hon. Robert G. Doumar, United States District Judge for the Eastern District of Virginia, sitting by designation.

and was docked at the facilities of defendant Newport News Shipbuilding and Dry Dock Company (Newport) for repairs. Defendant Bethlehem Steel Corporation (Bethlehem) contracted with USL to provide supervision for the repairs, but arranged for defendant Turbine Enterprises, Inc. (TEI), to furnish this supervision. TEI provided an incompetent supervising engineer, workmen furnished by Newport were negligent, and this suit ensued when damage to the turbine was discovered shortly after the ship left Newport's yard. The district court found all three defendants liable to USL. The liability of Newport and Bethlehem was predicated not only on negligence, but also on breaches of contract and of warranties of workmanlike performance. TEI's liability was premised on negligence and breach of warranty. Additionally, Bethlehem was held to be entitled to indemnity from Newport under a negligence theory and from TEI under negligence and contract theories.

## I.

The SS AMERICAN COURIER (COURIER) entered the Newport shipyard in the spring of 1977 for multiple repairs, including repair to its turbine. Because the turbine had been manufactured by Bethlehem, USL contracted with Bethlehem to provide a supervisor for this specific work, although Newport personnel supervised other repairs. George Murphy, port engineer for USL, had general supervisory authority over the repairs to the COURIER, but not over the turbine work. The contract between USL and Newport provided that the latter would not provide any supervision for the turbine work, but would only provide workers to carry out the manual labor required by the Bethlehem service representative. Bethlehem repeatedly assured USL that it would provide one of its expert supervisors to oversee the turbine's repair. All of its turbine specialists were otherwise assigned, however, and without advising USL in advance, Bethlehem contracted with TEI for one of its "experts" to supervise the COURIER turbine work. TEI sent its employee, John L. Dye, to supervise the turbine repairs and he identified himself to Murphy as a TEI employee. Dye was instructed to proceed with the work utilizing the laborers furnished by Newport. TEI billed Bethlehem on an hourly basis totaling $4,913.52; Bethlehem billed USL for the same amount of hours at its own higher rate for a total of $6,763.02, without explaining or indicating the involvement of TEI.

The trial court's comprehensive factual findings include a detailed technical description of the COURIER's power system and of the repair requirements that brought it into Newport's yard, which we restate verbatim:

The SS AMERICAN COURIER is a steam powered vessel. Its main engine is a steam turbine. A steam turbine is most efficient at high speeds, but a propeller, the ultimate means of propulsion of the ship, is more efficient at lower speeds. In order to achieve maximum efficiency, it is necessary to transfer the generated power from a high speed turbine to a lower speed propeller. The transmission of different levels of power within the main propulsion system of a steam turbine powered vessel is the function of reduction gears.

The casualty sustained by the AMERICAN COURIER involved in this litigation was to the first reduction gear on the low pressure side (the vessel was equipped with a double reduction system), specifically the high speed pinion of the low pressure turbine and its matching low speed gear.... [The] turbine drives the pinion gear which in turn mates with the first reduction gear. Separating the low pressure turbine from the reduction gear ... is a floating or flexible coupling. This flexible coupling consists of a female ring gear bolted to the turbine rotor at the forward end and a male ring gear bolted to the quill shaft of the pinion at the aft end. The gear teeth of the aft male ring gear slide into the mating teeth of the forward female ring gear. As the rotor and the attached female ring gear rotate, the male ring gear and attached pinion gear are caused to rotate.

The rotating of the male ring gear and the pinion causes in turn the first reduction gear to which they are attached to rotate, and thereon through further gears ultimately resulting in rotation of the propeller.

In order to repair the damaged gears, it was necessary to remove the turbine rotor, have it repaired and then reinstall it. The district court found that Dye boarded the COURIER late on May 17, 1977, and instructed the Newport machinists to prepare the coupling for disassembly. When Dye returned the next morning, he discovered that the laborers had not only removed the bolts securing the coupling cover, but had also removed the bolts attaching the male gear to the quill shaft. Even though the removal of these bolts is not only unnecessary, but undesirable, Dye did not order the Newport employees to replace them. Dye then began the removal of the flexible coupling. He personally marked the male and female gears of the aft coupling, and instructed the machinists to likewise mark the forward coupling. The evidence at trial disclosed that the machinists did not perform this task, relying instead on factory punch markings present on the gears. When Dye completed marking the aft gear, the quill shaft was slipped back to allow the rotor clearance. While the male gear normally would not be removed in the process, its earlier unbolting rendered it susceptible to harm. Instead of having the machinists reattach it to prevent accidental damage, Dye had it removed altogether.

On May 18, the rotor was removed and sent out for repair. When it was returned on May 30, the male gear was reinstalled on the quill shaft under Dye's supervision. The machinists that were assisting Dye told him that marks on the male gear were the ones they put on according to his instructions during disassembly. According to Dye, the marks were aligned so that two marks on the female gear teeth were juxtaposed with the single mark on the meshing male gear tooth. Due to Dye's inexperience with turbines generally and his belief that "a turbine is a turbine", he did not know that this alignment of marks indicated an improper installation. The Bethlehem turbine manual kept on board the ship was not consulted, a step that TEI's own expert testified was essential, and the coupling was reassembled. During the reassembly process, four of the sixteen fitted bolts holding the gear ring to the quill shaft were damaged. On Dye's orders, the Newport machinists refinished these bolts to allow reassembly. Dye left the job to eat, and when he returned, the machinists told him there were no difficulties in reassembling the coupling. On June 1, the COURIER completed dock trials without a hitch, and headed out to sea. Early on the morning of June 2, the engines were stopped after a noise was heard in the reduction gears. The COURIER was then towed by tugboat to Bethlehem's yard at Hoboken, New Jersey.

The trial court found that the damage to the reduction gears occurred because the male gear ring was improperly installed while the ship was being repaired at Newport's yard. In finding Newport negligent, the district court specifically concluded that Newport's employees unbolted the male gear without Dye's approval, failed to apply "match marks" to the fore end of the coupling gears, falsely told Dye the marks had been made, and reassembled and installed the coupling while Dye was at lunch and assured him that all was in proper order. The trial court further determined that Bethlehem was negligent in failing to ascertain the qualifications and competence of the supervisor it obtained from TEI, and that the effect of this negligence was compounded by its failure to inform USL that it was relying on TEI to provide a capable supervisor. Finally, TEI was negligent for Dye's failure to exercise "at least the skill and knowledge commonly possessed by turbine service experts."

## II.

Newport contends that the trial court erred in finding any liability on its part for damage to the turbine and erred in finding it liable to indemnify Bethlehem for any

damages to be paid by it to USL. TEI contests the trial court's finding of its primary liability, but not the finding requiring it to indemnify Bethlehem. We conclude that the trial court's findings on the issues of primary liability of Newport, Bethlehem and TEI are amply supported by the record and the applicable law, but reverse its determination that Bethlehem is entitled to indemnification from Newport.

## A.

█ It is true that Newport only agreed to supply laborers to USL to perform non-supervisory work involved in the turbine repair. Irrespective of the "menial" nature of their assignments when they began the work, however, the Newport laborers took it upon themselves to act in derogation of Dye's orders, and these Newport mechanics were guilty of the most obvious negligence, if not intentional misconduct, in their actions relative to the turbine repair. They removed the coupling cover in disobedience of specific instructions; they not only failed to mark the matching gears appropriately, but went on to falsely advise Dye that the gears were marked in order to be reassembled in the same configuration they were in prior to disassembly—the direct cause of the erroneous reverse assembly of the gears. In further violation of specific instructions, the Newport mechanics, while Dye was absent, forced the coupling to be rebolted in such an abnormal position that tremendous axial stress was produced, causing the coupling to "spring apart with a bang" when it was subsequently opened for repairs in Hoboken, New Jersey. Newport is correct in asserting that it contracted only to provide laborers for the turbine work, but it holds itself out, and has previously been recognized by this court, as one of the nation's outstanding shipyards. *White v. Johns-Manville Corp.*, 662 F.2d 243 (4th Cir. 1981). USL could reasonably expect that upon entering and utilizing Newport's facilities that Newport would exercise the standard of care incumbent upon a reputedly competent seaport installation. Newport personnel in fact accomplished most of the repairs on the COURIER, and

although Newport only furnished laborers for the turbine portion of the repair, it nevertheless was liable for their negligent acts in performing the very work they were engaged to do.

█ Newport's contention that USL was guilty of contributory negligence merits little discussion—the COURIER repairs were completely under the control of Newport, Bethlehem and TEI, and USL had no duty to exercise any more care than it did. We likewise do not credit its argument that the trial court should have determined ultimate liability based on the doctrine of comparative negligence. This theory was not advanced at trial, and absolutely no evidence was offered on which the trial court could have made comparative negligence determinations.

## B.

Newport also contends that the trial court erred in ruling that it was liable to indemnify Bethlehem. We reverse that portion of the judgment. The trial court premised its finding on the conclusion that Newport was guilty of "active" negligence whereas, in its view, Bethlehem committed only "passive" negligence triggering the right to indemnification. We disagree.

█ The patch of legal terrain sprouting the "active"-"passive" theory for differentiating degrees of negligence is overlaid with a pretty heavy thicket. Determinations of indemnity issues by this "active-passive" standard are not always consistent, and other means of apportioning ultimate culpability have been adopted in other circuits. *See Loose v. Offshore Navigation, Inc.*, 670 F.2d 493 (5th Cir. 1982) (comparative fault); *Griffith v. Wheeling-Pittsburgh Steel Corp.*, 610 F.2d 116 (3d Cir. 1979), *vacated*, 451 U.S. 965, 101 S.Ct. 2038, 68 L.Ed.2d 343 (1981), *on remand*, 657 F.2d 25 (3d Cir. 1981) (comparative fault); *but see E. I. DuPont de Nemours v. Riverway Harbor Service*, 639 F.2d 404 (8th Cir. 1981). Judge James Dickson Phillips, stating this circuit's rule, captured the elusive essence of the "active-passive" doctrine in *White v. Johns-Manville Corp.*, *supra*, where he stated:

This theory of indemnity—that the indemnitor is guilty of active, primary or original fault while the indemnitee is guilty only of passive, secondary or implied fault—is recognized in admiralty. *See, e.g., Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Co.*, 410 F.2d 178 (5th Cir. 1969). It applies a restitutionary principle to the situation where one person discharges a liability that has been imposed on him by operation of law, but which—because of another's 'primary' fault—should have been discharged by the other. *See Restatement of Restitution* § 76 (1937).

The distinction between primary and secondary liability for this purpose is not based on a mere difference in *degrees* of fault but rather on a 'difference in the *character* or *kind* of the wrongs which cause the injury and in the nature of the legal obligation owed by each of the wrongdoers to the injured person.' *Builders Supply Co. v. McCabe*, 336 Pa. 322, 77 A.2d 368, 370 (1951). Where the indemnitee's liability is merely constructive, vicarious or derivative, the burden for the entire loss may be shifted to the indemnitor whose actual fault caused the injury. *Danny's Construction Co. v. Havens Steel Co.*, 437 F.Supp. 91, 93 (D.Neb.1977); *see Restatement of Restitution* §§ 94, 95, 96 (1937). *Id.* at 249. The determination of whether a defendant's liability is secondary by virtue of being constructive, vicarious or derivative requires an application of law to the facts, and the ultimate conclusion is, of course, one of law, *United Air Lines, Inc. v. Wiener*, 335 F.2d 379, 401 (9th Cir. 1964), *cert. dismissed*, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed. 549 (1964); *see generally Pullman-Standard, Inc. v. Swint*, —— U.S. ——, —— n.19, 102 S.Ct. 1781, 1790 n.19, 72 L.Ed.2d 66 (1982), for which substantive maritime law provides the rule of decision. *White v. Johns-Manville Corp., supra* at 247.

■ Bethlehem's negligence in furnishing the engineer to supervise the removal and reinstallation of the turbine cannot reasonably be characterized as "passive" under the rule articulated in *Johns-Manville.*

Bethlehem's liability to USL was not based on the wrongful acts of another, nor did it stem from some reliance on information from Newport. Instead, Bethlehem's deceptive acts directly and distinctly contributed to USL's loss. Bethlehem, utilizing its reputation in USL's eyes for competence and integrity, furnished USL with a patently unqualified supervisor. It blindly depended on TEI to send over a "specialist", and took no action to satisfy itself that this supervisor was capable of performing the assigned work. As it developed, he was singularly incapable of performing the assigned task and his incompetence was a direct cause of the botched job.

■ That Bethlehem was only the conduit through which the engineer was furnished is not the critical factor in characterizing its negligence. Each court considering this issue in a given case will no doubt be faced with different factual settings giving rise to a finding of negligence. It is not, however, the "form" of a discrete act or omission that defines the character of negligence as "active" or "passive." Rather, it is the relationships between the parties involved and the nature of the legal obligation violated by the negligence that decides the issue. Bethlehem had a duty to USL to exercise reasonable care in the selection of a supervising engineer. It was purposefully deceitful; its deceit concealed the negligent choice of an incompetent supervising engineer, and the technical naivete of that engineer was a critical ingredient in the negligence, without which the damage would not have occurred. This negligence was direct and just as "primary or active" as that of Newport, and neither is entitled to indemnification by the other.

AFFIRMED IN PART

REVERSED IN PART.